UNITED STATES, Appellee

v

JOHN M. KAZMIERCZAK, Airman Third Class, U. S. Air Force, Appellant

16 USCMA 594, 37 CMR 214

594

No. 19,700

March 31, 1967

*Lieutenant Colonel Milton E. Kosa* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph Buchta.*

*Lieutenant Colonel Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

QUINN, Chief Judge:

This case presents an important question as to the individual's right of privacy within the military community. It arises from a ruling by the law officer admitting certain matter in evidence at accused's trial on a number of charges, including breaking into the Consolidated Mail Room, Gunter Air Force Base, Alabama, with the intent to commit larceny therein, in violation of Article 130, Uniform Code of Military Justice, 10 USC § 930.

About midnight on Friday, December 17, 1965, Staff Sergeant Jerry A. Holt, a student assigned to the 3792d Student Squadron at Gunter, parked his car in a parking lot behind the post office building. As he proceeded from the lot to his barracks, he saw a man seated "at the corner" of the post office building "facing toward the front." He was near a door leading to the lobby. From the man's appearance, Holt thought he was intoxicated. As a result, when he arrived at his barracks he tried to telephone the Air Police to have the man "taken to his barracks," but he could not reach them. Accompanied by Airman Robert O. Siegert, he returned to the post office "to see if the man was still there." About five minutes had elapsed. The man was gone, but at the place he had been, Holt discovered a "U. S. mail bag and a number of packages scattered over the area." As Holt and Siegert "were talking," the accused approached. The accused was a student assigned to the same squadron. When identified as the man Holt had seen earlier, he was escorted to Holt's room. Holt again tried to reach the Air Police, but failed. He "had two . . . men stay with . . . [the accused] in the room," while he drove to the Air Police station. In Holt's absence, the accused tried to leave, but was "stopped" by Holt's roommate.

Holt reported the incident to the Air Police. As a result, Air Police Sergeant James W. Wilkinson proceeded to the post office. He stationed a guard over the mail bag, the mail packages, and a claw hammer on the ground outside the building, and inspected the interior of the structure. In the lobby, he found a door leading into the mail room had been broken open. He also found several locked boxes for individual mail had been broken into. Wilkinson then went to Holt's room and "took" the accused to the Air Police station. Special Agent Ancil T. Johnson, Office of Special Investigations, was called. He and another agent went to the post office and inspected the scene. Thereafter, they interviewed the accused at the Air Police station. After being informed the agents were investigating "the breaking into the airmen's post office and stealing mail from the post office," and of his right to remain silent and to obtain legal counsel "prior to the interview," the accused attempted to account for his presence at the post office. He said he had been at the bowling alley until about ten o'clock. When he left, he went directly to his barracks. The route led past the post office. As he approached the building he "felt sick," and leaned against the railing in front of the building. A "couple of fellows" came along, and called his attention to the mail bag. He suggested they call the Air Police. They went to the barracks next to the post office, where he waited until the Air Police came. He insisted he did not know anything was "wrong" until the other fellows "pointed out the mail bag." Johnson terminated the interview because the accused "appeared to be tired."

In the course of the interview, Johnson noticed something on the accused's right cheek. Initially, he thought it was dirt, but he later determined the matter consisted of "flecks" of paint. They were removed from the accused's cheek and marked as evidence.[1] The accused was then

---

[1] Laboratory analysis established "no distinguishable differences" between the several layers of paint on these "flecks" of paint and the layers

transported to Maxwell Air Force Base and placed in confinement.

About the time of the termination of the agent's interview with the accused, Sergeant Marvin Parker, First Sergeant of the accused's squadron, was called by the Air Police and advised the accused was in custody. Several hour later, Parker went to the Air Police station. He talked to the Air Police and Office of Special Investigations agents. The subject of their conversation is not disclosed in the record of trial. Parker then went to the squadron orderly room, and telephoned Major Edwin J. McBride, the Squadron Commander, at his home. What transpired thereafter provides the immediate background for the accused's assignments of error.[2] Sergeant Parker informed Major McBride that the accused was in confinement for illegal entry into the post office. The Major directed him "to inventory" the accused's clothing and property "and safeguard it." He also indicated he would meet Parker in the accused's room.

According to Parker, he arrived at the accused's room at about 9:00 a.m. He was accompanied by Airman Third Class Mario J. J. Giacomotto, who identified the room for him. Two of the regular occupants were present; Airman First Class Gaylord P. Miller was in bed reading, and Airman First Class Larry Cox was asleep. Miller pointed out a chest of drawers used by the accused. Parker opened one of the top drawers to empty it, and saw two Government payroll checks made out to different members of the squadron. Giacomotto testified that Parker also opened a second drawer, and discovered six unopened packages of mail addressed to other airmen on the base. Parker proceeded

no further. He directed Giacomotto to telephone the OSI while he waited. Giacomotto called the Air Police office, and asked that the OSI be notified "to come to the barracks right away." Agent Forrest K. Geno and Agent Johnson were on the base. At the time of trial Agent Geno was in the Lackland Air Force Base Hospital and was not available as a witness. Agent Johnson testified he had been called to the base earlier that morning. He and Agent Geno were at the chaplain's office,[3] when informed that Parker wanted them to come to the accused's room.

Johnson did not know why Parker had called. He had not requested Parker to search the accused's room, and had not asked Major McBride for permission to "go up and look" through the accused's belongings. On entering the accused's room with Agent Geno, he saw two men "sitting on their beds," and Parker standing in front of a chest of drawers with some of the drawers "pulled out." Parker informed them he had been "collecting" the accused's effects and discovered "packages . . . not addressed to" the accused in one of the drawers; he also mentioned "a couple of checks." Parker pointed out the various articles, and asked the agents if he "should go ahead and inventory this property." Johnson "agreed that . . . [he] should," and that he "could go through the locker." What happened in the moments that followed is the subject of some disagreement. On one side is the testimony of Major McBride, Sergeant Parker, and Agent Johnson; on the other is the testimony of Airman Giacomotto.

Sergeant Parker's testimony indicates Major McBride arrived just as Agent Johnson told him he could go

---

of paint on wood chips taken from the floor of the mail room at the site of the broken door.

[2] Part of the evidence appears only in an out-of-court hearing on a defense objection to the admission of certain testimony; the remainder was presented in open court. Normally, the validity of a ruling by the law officer is determined on the basis of the

evidence before him at the time thereof. See United States v Dicario, 8 USCMA 353, 24 CMR 163. However, defense counsel later renewed the motion. Consequently, we can properly consider all the testimony that bears upon the issue.

[3] A hammer, like the one found outside the post office, had been reported stolen from the chaplain's office.

ahead with the inventory of the accused's effects. Thus, he testified that, while he could not recall whether he had actually listed any item on the inventory sheet, he was sure the Major arrived "[v]ery shortly" after Johnson did. He estimated the time as "five minutes, perhaps." Johnson's testimony is substantially to the same effect. However, Airman Giacomotto testified that Major McBride arrived about ten minutes after the agents.[4] His account as to what they did before the Major appeared is as follows:

"Q. What transpired in the room that you personally observed? Will you state to the members of the court what you personally observed?

"A. Yes, sir. We started personally gathering up Airman Kazmierczak's clothes . . .

"Q. Who is 'we'?

"A. First Sergeant Parker and myself. First Sergeant Parker questioned the three NCO's[5] to identify their dressers. Then we proceeded to empty out his dressers.

"Q. When did the OSI come in during this time?

"A. About five minutes later, sir.

"Q. What, if anything, did they do?

"A. They looked around. They checked underneath the dressers, underneath the mattress . . .

"Q. You are speaking of the OSI agents?

"A. Yes, sir.

"Q. Will you describe what you mean by looking underneath the mattress?

"A. Turned the mattress up, tore up the bedding, checked between the sheets.

"Q. How many OSI agents were there?

"A. Two, sir.

"Q. Other than Mr. Geno, would you describe the other OSI agent?

"A. Well, sir, I didn't pay much attention to the agents.

"Q. If he were brought into court at this time do you think you could recognize him?

"A. Not positively, sir.

"Q. Not positively?

"A. That's right, sir.

"Q. Was Mr. Geno the agent who tore up the bed?

"A. Yes, sir.

"Q. You are sure it was Mr. Geno?

"A. Sir, one was doing the questioning and the other man was tearing up the bedding. I was taking coats off the racks and putting them in Airman Kazmierczak's bag.

"Q. Do you know which agent it was that was tearing up the bedding?

"A. No, sir, not positively.

"Q. How long had the OSI agents been there when Major McBride entered the room?

"A. About ten minutes, sir.

"Q. Had the agent, whoever he was that was tearing up the bed— was this done prior to or after the time Major McBride entered the room?

"A. Prior, sir."

Major McBride's testimony is consistent with Sergeant Parker's and opposed to Airman Giacomotto's. He said he arrived at the accused's room about 9:30 a.m. He saw Airmen Miller and Cox in their respective beds. Also present were Parker, Agents Johnson and Geno, Sergeant Finley, and Giacomotto. As he entered, he observed a dresser with the top drawer open; the agents were "standing back of Sergeant Parker." Parker immediately directed his attention to the Government checks and the unopened mail packages. As soon as he saw these, he told Parker to search the room and the barrack's area, and

---

[4] Master Sergeant Joseph M. Finley, an Air Police investigator, testified he "was in the company of the OSI" agents when they went to the accused's room. Although he was not "sure of it," he thought Major McBride was in the room or in the hallway when he arrived.

[5] There were only two, Miller and Cox.

he told Miller and Cox to check their effects to "see if there was something else in there." He remained until the search was completed. Before leaving, he instructed Parker to list the checks and packages in the inventory of the accused's effects, and then turn them over to the OSI agents on a hand receipt. Asked why he had assumed this "investigative capacity," he answered that, when he saw the checks, he decided he had to "exercise . . . [his] command prerogative." Johnson testified that after Major McBride ordered the search, he looked in the accused's locker, but other than that he was an observer "because the sergeant was there and the Commanding Officer was present."

Later in the afternoon of December 18, Johnson interrogated the accused. After being again advised of his rights, the accused made a statement in which he maintained he had found the sack of mail beside the post office building. He admitted he removed several unopened packages and sealed envelopes which he took to his room. There he opened the letters and extracted the Government checks he found. He denied he had broken into the mail room.

At trial, defense counsel objected to the admissibility of the checks, packages, and the accused's second pretrial statement on the ground they were the products of an illegal search and seizure. The objection was overruled. The correctness of the ruling hinges upon two questions: (1) Is the regulation, providing for an inventory of the effects of a person in confinement, on its face violative of the Fourth Amendment which protects all persons against unreasonable search and seizure? (2) If the regulation is valid on its face, was it used as a pretext to conduct a search without probable cause?

In recent decades, the scope of constitutionally protected rights and privileges of the individual has been substantially redefined. Many practices evolved on the basis of the old, and more circumscribed, concepts have failed to meet the challenges of the new definitions. A thick coat of tradition, therefore, is no assurance of constitutional acceptability. Consequently, we approach the questions raised by this appeal unencumbered by the weight of years that the inventory practice has been in effect in the armed services.

We start with the fundamental principle that persons serving on active duty in the armed forces of our country are not divested of all their constitutional rights as individuals. True, Article I, Section 8, Clause 14, of the Constitution of the United States confers upon Congress the power to "make Rules for the Government and Regulation" of the military, but that power, like all the other powers of Congress enumerated in Section 8, must not be exercised in contravention of individual rights guaranteed by the Constitution. However, the Constitution itself recognizes that certain individual rights cannot appropriately be exercised in a military setting to the extent they can in the civilian community. Thus, it expressly exempts " 'cases arising in the land or naval forces' " from the requirement of presentment or indictment by a grand jury. Other exemptions may be spelled out by necessary implication. Ex parte Quirin, 317 US 1, 40, 87 L ed 3, 63 S Ct 2 (1942).

Specific and implied exemptions, however, are not the only determinants of the operative scope of a constitutional right. The Founding Fathers were eminently practical. They recognized inherent limitations on the rights that were directly guaranteed. As Justice Holmes observed, even "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre, and causing a panic." Schenck v United States, 249 US 47, 52, 63 L ed 470, 39 S Ct 247 (1919). The basic elements of the inherent limitations depend upon the time, the circumstances, and the place. See United States v Voorhees, 4 USCMA 509, 16 CMR 83. What this means is that in the interplay between the exercise of governmental power and the exercise of a constitutional right by the individual, reason must be the

**599**

arbiter. Time and circumstance may require a balance to be struck at one point in the civilian community, but at another in the military.

The rule of reason applies to the individual's protection against search and seizure guaranteed by ▮▮▮▮ the Fourth Amendment. The Amendment does not forbid all searches and all seizures. It prohibits only "unreasonable" intrusion into the privacy of the individual's home and seizure of his possessions. Consequently, there are occasions when the individual's right of privacy yields to the Government's right to perform a proper public function. Frank v Maryland, 359 US 360, 3 L ed 2d 877, 79 S Ct 804 (1959); Abel v United States, 362 US 217, 4 L ed 2d 668, 80 S Ct 683 (1960); State v Rees, 139 NW2d 406 (Iowa) (1966). Without implying legality from the label alone, it can, in a general way, be said that the individual's constitutional rights are not infringed when he is required to yield to an "administrative" process in the discharge of a governmental function. For example, it is not a violation of the privilege against self-incrimination to require the individual to report a motor vehicle accident in which he is involved as a driver. United States v Smith, 9 USCMA 240, 26 CMR 20. Nor is it a violation of the privilege to require him to report an attempt to compromise security information. United States v Kauffman, 14 USCMA 283, 34 CMR 63. Similarly, there is no invasion of the right of privacy in requiring the individual to submit to an accepted medical procedure for a medical purpose. United States v Hill, 12 USCMA 9, 30 CMR 9. And, it is not an "unreasonable" search to conduct a "shakedown" of the individual's effects to determine his readiness to carry out his military duties. United States v Lange, 15 USCMA 486, 35 CMR 458. We must, therefore, be guided by a rule of reason in examining the legality of the inventory regulation.

It is well settled that the private possessions of a member of the military are not open to indiscriminate ▮▮▮▮ search for evidence of ▮▮▮▮ criminal conduct. United States v Battista, 14 USCMA 70, 33 CMR 282; cf. United States v Gebhart, 10 USCMA 606, 28 CMR 172. The inventory regulation does not purport to authorize a search. It imposes a duty upon the unit commander to cause an "inventory" to be made of all the clothing of an airman "[i]mmediately upon notification" that the individual has been placed in confinement. It also requires the commander to insure the physical safekeeping of the clothes. See Appendix. These responsibilities exist without regard to the nature of the offense for which the accused is confined, and apply to an accused already tried and convicted as well as one awaiting trial. It is apparent, therefore, that in most cases the inventory will not uncover any matter relevant to a criminal prosecution. This circumstance alone tends strongly to the conclusion that it was not designed as a subterfuge for a search without probable cause. But, more importantly, the provisions of the regulation reveal a legitimate purpose, and satisfy an apparent legitimate need.

The stated purpose of the inventory is to insure "safekeeping" of the personal effects of an absentee. The necessity for safekeeping, especially in organizations comprised of transient personnel, is rooted in human nature. Unfortunately, we have not yet reached a stage of interpersonal relationships in which we can know, with absolute certainty, that unattended property will remain unmolested.

Another obvious and legitimate reason for the regulation is manifest in the nature of the military unit. The unit functions under a table of organization, in which each person assigned to it has defined responsibilities. It must be ready for emergency operation in time of peace as well as war. Consequently, even the temporary absence of a member of the unit may require an immediate replacement. If the absent member has left his posses-

sions in the unit, these must be removed to make room for those of the replacement.

Common sense indicates the absentee's effects cannot be tossed casually into a sack and stored. A delicate watch may be in the fold of a handkerchief, or a loosely-capped container of cleaning fluid may be among some ties. Common sense also indicates that each article stored for the absentee should be listed to guard against a later claim of damage or loss. Still other reasons are suggested by Government counsel. Those mentioned, however, are sufficient to justify a conclusion that the inventory process is "a legitimate, normal, and customary routine" in military administration. United States v Coleman, 32 CMR 522, cited with approval in United States v Rosado-Marrero, 32 CMR 583, 585, petition for review denied, 13 USCMA 700, 32 CMR 472. We hold, therefore, that the inventory procedure prescribed by the regulation is not *per se* contrary to the constitutional prohibition against unreasonable search and seizure.

We turn to whether the regulation was used as a means to effect an illegal search. There are actually two aspects to this question. One deals with whether the inventory process was deliberately invoked as a pretext to ferret out possible evidence of a crime. The second is concerned with whether, apart from the good faith of the decision to inventory the accused's effects, the subsequent conduct of the parties amounted to an illegal search for evidence or the fruits of a crime. See United States v Lange, supra.

Neither at trial, nor on appeal, have the accused's counsel directly challenged the good faith of the decision to inventory the accused's effects. There are, however, some intimations in their arguments that cast doubt on the *bona fides* of the decision. For example, appellate defense counsel ask "[w]hy else would . . . [Sergeant Parker] call for the OSI to be present?" Parker indeed admitted he did not telephone Major McBride until after he had visited the Air Police office and talked to the Air Police and

OSI agents. This circumstance alone, however, does not justify an inference that Parker agreed to act as cat's-paw for the agents. The record does not disclose the content of the conversation, but Agent Johnson testified, without impeachment, that he did not know why Parker called him to the accused's room. Also Parker's conduct and his remarks to the agents immediately upon their entry are inconsistent with any prearranged plan to search.

If there had been an agreement to use the inventory procedure as a ruse for a search, we would expect Parker to display the uncovered loot with some degree of delight. Instead, he expressed concern as to his authority to continue with his administrative task; and instead of seizing the fruits of the crime, he was apparently afraid to handle them for fear of interfering with the agents' investigation. Thus, the fact that Parker called the OSI is evidence of his cooperation with them; but that cooperation was not to deprive the accused of his constitutional rights. As Justice Frankfurter observed in a related connection in Abel v United States, supra, 362 US at page 240, "no consideration of civil liberties commends discouragement of such cooperation" between a Government employee discovering evidence of a crime in the course of carrying out an administrative function and law enforcement officers. So far as Parker was concerned, therefore, the record clearly supports the conclusion he was not a dupe or tool of the agents in the decision to comply with the inventory regulation. As to Major McBride's role, the record of trial compels the conclusion he did not authorize the inventory as a cover for a search. He explicitly testified his original interest in the matter was only "because the man was being held by the Air Police and I wanted to have his property secured." The record of trial, therefore, demonstrates the good faith of the decision to inventory the accused's effects.

On the basis of a selective reading of the record, the accused maintains

that what took place in his room was not preparation of an inventory under the regulation, but an impermissible, exploratory search. The argument depends upon two assumptions: (1) That the packages were found *after* the OSI agents told Parker he could continue with the inventory; and (2) that the agents searched the accused's room and tore apart his bedding *before* Major McBride arrived. Both assumptions are contrary to the clear weight of the evidence.

It will be recalled that Giacomotto testified both the packages and the checks were found before ▮▮▮▮▮▮ ▮ Parker told him to telephone the Air Police office. Appellate defense counsel urge disregard of this testimony as patently "mistaken" because it differs from the testimony of Parker and Agent Johnson. Parker's testimony does indicate the packages were discovered after Johnson told him he could go on with the inventory. However, Johnson testified that when he entered the accused's room, Parker told him he had been "collecting" the accused's personal effects and "had discovered some *packages* in his dresser." (Emphasis supplied.) On the evidence before him, the law officer was certainly justified in concluding that the checks and the packages had been discovered before the agents were called. In any event, assuming only the checks had been found, the record still compels the conclusion that when Parker opened the other dresser drawers he was not searching for more evidence of criminal activity by the accused, under the pretext of preparing an inventory of the accused's effects. His manifest concern, as evidenced by the remarks on which we commented earlier, was with the proper discharge of his administrative task.

Reversing their condemnation of the above-mentioned part of Giacomotto's testimony, appellate defense counsel placed complete reliance upon another part of it to support the contention that immediately upon seeing the checks, the agents searched the room and tore apart the accused's bedding. They argue the agents' conduct indi-

cates that from that point the parties present were embarked upon a search, not an inventory. See United States v Lange, supra. Giacomotto's testimony, however, is not the whole story. He was contradicted by Agent Johnson, Sergeant Parker, and Major McBride. Their testimony demonstrates there was no search, in the sense of a hunt for evidence, until Major McBride ordered an inspection of the entire room, after he entered and saw the checks and packages.

While the agents' conduct in the room was in nowise unlawful, it can be asked whether, in the ▮▮▮▮▮▮ ▮ first instance, they had a legal right to enter. The Constitution does not prohibit the police from visiting private premises for the purpose of official inquiry. United States v Horton, 328 F2d 132 (CA3d Cir) (1964). Nor is it impermissible, under the Constitution or the Uniform Code of Military Justice, for military law enforcement officers to enter premises in response to the invitation of a proper person. United States v Burnside, 15 USCMA 326, 331, 35 CMR 298. In that connection, People v Rightnour, 52 West's Cal Rptr 654 (1966), provides an appropriate comparison to the situation in this case.

In *Rightnour*, the accused occupied a hotel room at the invitation of the regular guest. One afternoon, in order to perform routine cleaning chores, the maid entered the room. She observed that the bedding had been burned; window blinds had been torn down; and the room was in great disarray. She reported her observations to the manager who, because of an incident the previous week, had instructed the employees to be on the alert for possible incendiary fires. The manager went to the room, viewed the disorder, and telephoned the police. He testified he did so because he was worried about the " 'fire problem' " and the "possibility of burglary." *Id.*, page 656. In due course, police officers arrived. They looked about and, among other things, saw narcotic paraphernalia. Later, the accused was charged with unlawful pos-

602

session of narcotics. At trial, the accused contended the room was entered illegally. Rejecting his contention, the California Fifth District Court of Appeals said:

"The burden of proof was on the prosecution to show that the entry was proper since it was not made with a warrant. . . . It would be unrealistic to require a maid to remain silent upon finding a room in a hotel in the condition which the room in this case was in. It would be equally unrealistic to require a hotel owner to remain silent upon finding a room torn up, with burnt bedding and papers strewn all over the floor; and it would be just as unrealistic to require police, in the line of their duty, to refuse to enter a hotel room when the owner informed them that he wished them to investigate the possibility of arson or burglary of one of his guest's rooms.

. . . . . .

"Bielicki v Superior Court, 57 Cal 2d 602, 608, 21 Cal Rptr 552, 371 P 2d 288, requires that there must be something other than reasonable belief in apparent authority to justify the search. But here, the hotel owner called the officers to investigate possible offenses against his property. He was not concerned with searching to find evidence that might be used against appellant or anyone else in connection with the narcotics traffic. Stoner v State of California, supra, 376 US, at pages 488–489, 84 S Ct 889, does not render the evidence here inadmissible. The 'apparent authority' doctrine should not apply where an owner is reasonably in fear for the safety of his property and that of his guests. In such case the owner has actual authority to authorize entry. While we are aware that 'subtle distinctions' should not be imported into the law surrounding the constitutional right to be free from unreasonable searches and seizures (see Jones v United States, supra, 362 US 257, 266–267, 80 S Ct 725), under the facts here disclosed it would appear that the 'subtle distinction'

is sought to be imported by the appellant who in effect urges that because the circumstances disclosed by the evidence fit together in a neat chain they must therefore be suspect and in fact show that by some method, undisclosed by the evidence before us, the police did in fact have prior knowledge of the presence of narcotics in the hotel room. To adopt this line of reasoning would be to admit that any case based upon strong circumstantial evidence would raise a suspicion that that evidence was somehow manufactured or tainted by police activities. This is a position we cannot and will not adopt under the facts here before us." [People v Rightnour, supra, pages 658–659.]

Here, Parker, like the maid in *Rightnour*, was lawfully in the accused's room for a lawful purpose. He, like the maid, was unexpectedly confronted with evidence of an apparent crime. Of course, he could have gone himself to the Air Police, and informed them of what he had seen; in turn, they could have obtained authorization from a competent officer to enter and search. However, the test of legality of the conduct of the agents is not what might have been done for the procurement of authorization to search, but whether their entry was reasonable in the circumstances. Ford v United States, 352 F 2d 927 (CA DC Cir) (1965). Parker chose to telephone the police. As the court noted in *Rightnour*, this was the natural and obvious action of a responsible person. On their part, the OSI agents acted as reasonable and sensible persons; they went to the accused's room in response to the telephone call. As we view the evidence, there is no question of an attempt to waive or subvert the accused's constitutional protection against an unreasonable search by either Parker or the agents. Rather, the question is whether the agents could properly enter the room in response to Parker's invitation. United States v Mathis, 16 USCMA 522, 37 CMR 142. Reason and precedent indicate they could.

**603**

One question remains. Did the agents acquire possession of the checks and packages in ■ violation of any right of the accused? It is suggested that since the articles were discovered in the course of an administrative function, involving the private possessions of an individual, but pursued without a warrant issued upon probable cause, they cannot be used in criminal proceedings against the individual, without depriving him of the constitutional protection against unreasonable search and seizure. See, "Administrative Inspections and the Fourth Amendment—A Rationale," 65 Columbia Law Review 288 (1965). Assuming, without deciding, that the suggestion has some substance as to an administrative investigation into the individual's compliance with statute or regulation, it has no application to the inventory procedure before us. No investigation is contemplated by the regulation; and none was undertaken by Parker. What he found in the accused's effects was not something he was looking for, or reasonably expected to find. His sole purpose was to make a list of the accused's effects and gather them together in order to store them, properly and safely. When he suddenly was confronted with the fruits of a crime, he was not bound to close his eyes to their character and seal them with the innocent articles. As Justice Frankfurter observed in Abel v United States, supra, 362 US at page 238, when an administrative officer comes into lawful possession of criminal evidence, it is "entirely without reason to say that he must return it because it was not one of the things it was his business to look for"; on the contrary, he may turn over the evidence to the law enforcement branch of the Government.

Appellate defense counsel contend that before enforcement agents can take possession of the articles there must be probable cause to believe the property is stolen or contraband. Cf. United States v Conlon, 14 USCMA 84, 33 CMR 296. Although the validity of the contention may be doubted, we need not decide that question. See State v Turner, 101 Ariz 85, 416 P2d 409 (1966); People v Capra, 17 NY2d 670, 269 NYS2d 451 (1966). Probable cause for the seizure was present here. The post office had been broken into, and a mail bag had been stolen and ransacked. The accused was found at the scene, and accounted for his presence in a way that conflicted sharply with the report of an apparently reputable person. As a result, he was confined as a suspect. His squadron commander was informed of the confinement and the reason for it. It beggars common sense to suggest, as does the accused, that, because no report of loss had been received on the checks and the packages, only "mere suspicion" indicated they were the fruits of the post office theft. It is almost impossible to elude the conclusion they were probably part of the post office loot, and, therefore, were connected with the crime for which the accused was confined. The circumstances fully justified Major McBride's order to seize the articles and deliver them to the OSI agents.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

*Appendix*

In pertinent parts, AFM 67–1, Vol I, Part Three, Chapter Two, paragraph 76*b*(1) and *c*, is as follows:

"76. **Protection of clothing of absentees**

. . . . . .

"*b*. Personnel absent without leave (AWOL).

"(1) Immediately upon official notification that an airman is absent without official leave, his unit commander will designate a commissioned officer or a noncommissioned officer to take an inventory of all clothing left by the airman. The items and quantities of personal clothing so inventoried will be listed on DD Form 1150, 'Request for Issue or Turn-In,' in five copies. The name, rank, and service number of the airman concerned will be incorporated in the body of the DD Form 1150. In listing items on the

DD Form 1150, basic nomenclature from appropriate federal supply catalogs will be utilized. All copies of the DD Form 1150 will be signed and dated by the inventory officer. No entries need be made at the heading of DD Form 1150. The original and two copies of the DD Form 1150 will be inserted in the duffel bag or other container with the clothing. Copy number 5 will be retained in the unit suspense file pending return of copy number 4 from the base equipment management officer (BEMO). The clothing of the absentee will be turned over to the BEMO for safekeeping. Copy number 4 of the DD Form 1150 will be receipted and dated by a BEMO representative and will be returned to the unit for retention in the suspense file pending further action.

. . . . . .

"c. Clothing for prisoners.

"(1) Initial action when personnel are placed in confinement.

(a) Immediately upon notification that an airman has been placed in confinement, the unit commander will designate a commissioned officer or a noncommissioned officer to take an inventory of all the airman's clothing as outlined in paragraph 76b(1).

1. Airmen who are not reassigned to a prison unit will have in their possession minimum requirements as listed in AFM 125-2.

2. Airmen who are reassigned to the prison unit will have their clothing as inventoried, transferred to the jurisdiction of the confinement officer.

3. Personal clothing required while in confinement will be obtained as follows:

a. Airmen who have not been discharged will purchase clothing through category 11 or category 22 sale.

b. Airmen who have been discharged will be provided clothing as required by means of a category 63 sale.

4. Airmen in confinement who have been sentenced to be discharged (including those in AF retraining centers) and are subsequently restored to duty by remission or suspension of sentence shall be furnished a clothing allowance as follows: All personal clothing in airmen's possession shall be inventoried by the airmen's unit commander and those items meeting the standards for class B or better will be valued at 100 percent of the current cost for a like class A item. The total value of the inventoried items will be subtracted from the current initial monetary clothing allowance and the difference will be established on the airmen's pay record as a credit by means of a DD Form 114, 'Military Pay Order.' A copy of the showdown inspection record will be filed in the airmen's records jacket. Airmen will be entitled to the appropriate clothing maintenance allowance, effective the first day of duty in pay status, except that airmen who have not completed six months' active duty must complete six months of duty prior to entitlement to such allowance.

5. Confinement officers are responsible for the safeguarding of all clothing provided for prisoners. Items not in the physical possession of prisoners must be identified as belonging to specified personnel. Such clothing will not be retained in bins or bulk storage, but will be stored in a duffel bag or other suitable container, marked to indicate the airman's name and service number."

FERGUSON, Judge (dissenting):

I dissent.

I agree with my brothers that the Government may be entitled administratively to inventory and secure an individual's clothing when he is confined, both on the basis of necessity and its moral responsibility to care for property left unguarded by reason of its imprisonment of the owner. But its entitlement does not extend to the

utilization in evidence of incriminatory items found during such inventories. So to hold is to repeal the Fourth Amendment's requirement for probable cause to search. Under it, the commanding officer need now only exercise his undoubted authority to confine the accused. Thereafter, he may rummage at will through his effects in order to secure evidence against him and quite without regard to the need to fulfill the constitutional prerequisites for such action. The plea of necessity may sustain the inventory, but it cannot serve as the basis for the use of items discovered therein. So used,

"Necessity is the plea for every infringement of human freedom. It is the argument of tyrants; it is the creed of slaves." [William Pitt, as quoted in Congressional Record, February 21, 1967, at page S 2346.]

My brothers, however, conclude it is reasonable to require an individual to submit to the administrative process here involved; that the sole test is whether it was undertaken in good faith; and, if so, its fruits, thus lawfully discovered, are admissible in evidence. With this rationale, I cannot agree and, accordingly, I respectfully note my differing views.

First, an administrative search remains lawful only if the fruits thereof are to play no part in a criminal prosecution. The leading case is Frank v Maryland, 359 US 360, 3 L ed 2d 877, 79 S Ct 804, rehearing denied, 360 US 914, 3 L ed 2d 1263, 79 S Ct 1292 (1959), to which the majority make only brief reference. In that case, the question presented was the constitutionality of an ordinance permitting administrative inspection of buildings for rats, without a warrant or probable cause. The petitioner refused to permit such an inspection and was fined for recalcitrance. In upholding his conviction, a divided Supreme Court pointed out the long history in Maryland of such ordinances and that only administrative purposes were to be served by the examination of the premises. Specifically, it stated, at page 366, *"No evidence for criminal*

*prosecution is sought to be seized."* (Emphasis supplied.) It went on carefully to distinguish administrative inspections from those in which criminal evidence was to be uncovered. The Court emphasized the dual purpose of the Fourth Amendment in protecting one's privacy from official intrusion and in protecting one's self: "the right to resist unauthorized entry which has as its design the securing of information to fortify the coercive power of the state against the individual, information which may be used to effect a further deprivation of life or liberty or property." Frank v Maryland, supra, at page 365. And, the Court declared, "evidence of criminal action may not, save in very limited and closely confined situations, be seized without a judicially issued search warrant." *Id.,* at page 365.

The essence, therefore, of *Frank,* supra, is that the Constitution permits administrative searches which are designed to require civil correction of conditions connected with public health, safety, and the like. Where resort, however, is had to uncovering evidence of crime against an accused, it likewise bespeaks the Court's determination to prohibit such use of the administrative process and to relegate the authorities to the normal judicial search. Only by such an interpretation can the valuable protections against official intrusion to obtain incriminating evidence be maintained, and "it was on the issue of the right to be secure from searches for evidence . . . that the great battle for fundamental liberty was fought." *Frank,* supra, at page 365.

Indeed, Circuit Judge Prettyman, in District of Columbia v Little, 178 F2d 13 (CA DC Cir) (1949), would go even further. He stated, at page 18:

"Distinction between 'inspection' and 'search' of a home has no basis in semantics, in constitutional history, or in reason. 'Inspect' means to look at, and 'search' means to look for. To say that the people, in requiring adoption of the Fourth Amendment, meant to restrict invasion of their homes if government

officials were looking for something, but not to restrict it if the officials were merely looking, is to ascribe to the electorate of that day and to the several legislatures and the Congress a degree of irrationality not otherwise observable in their dealings with potential tyranny."

There is likewise nothing in Abel v United States, 362 US 217, 4 L ed 2d 668, 80 S Ct 683 (1960), on which my brothers rely, which supports the use in evidence of items seized during an inventory process. The search in that case was based upon a lawful arrest of the alien defendant and was held incident thereto.

On the other hand, the view that nothing obtained or observed during these administrative proceedings may be used in a criminal prosecution seems to be authoritatively supported. Thus, in People v Laverne, 14 NY2d 304, 200 NE2d 441 (1964), the New York Court of Appeals, interpreting Frank v Maryland, supra, held that evidence of violations of law observed by a zoning inspector's visit to the premises involved, could not be used against the defendant property owner. Similarly, in State v Buxton, 238 Ind 93, 148 NE2d 547 (1958), the Supreme Court of Indiana refused to uphold the admissibility of evidence of arson in a criminal prosecution as against the State's contention that it was seized by a fire marshal in the exercise of his statutory administrative authority to inspect burned premises without a warrant. Such use of the evidence, it said, was not permissible in a criminal proceeding, and it declared, at page 552:

"We therefore hold that under the Fire Marshal law the fire marshal and his deputies and agents must obtain a search warrant prior to searching a person's dwelling, effects or possessions for the purpose of obtaining evidence, to be used in a criminal prosecution and that this basic constitutional requirement can be and is by implication incorporated as a necessary part of the responsibility and activity authorized by the law."

To like effect, see "Administrative Inspections and the Fourth Amendment—A Rationale," 65 Columbia Law Review 288 (1965).

In sum, then, I would take the view that, while a commanding officer's authority to inventory and secure an accused's effects may be supported under the Fourth Amendment, items found during such process may not be used in evidence against him without a showing of compliance with the relevant constitutional limitation. That is my understanding of the position of the Supreme Court of the United States in Frank v Maryland, supra. See People v Laverne and State v Buxton, both supra. Otherwise the Fourth Amendment will become a dead letter, for the criminal investigator will inevitably be found behind the mask of the inventory maker.

Nor is it any answer to say that good faith is the test for upholding these inventory-searches. Police officers inevitably act in good faith, as do commanders, both in their role as magistrates and as commanders. And it was only as the latter that Major McBride authorized the inventory. Constitutional protections are designed to see that their actions, though in good faith, do not infringe upon the constitutional rights of the individual. When we free them from that restraint by permitting an administrative substitute for the heretofore exclusively judicial process of searching on probable cause, we, in my opinion, substantially and unconstitutionally broaden invasions of the military accused's privacy. For these reasons, I cannot concur in the rationale and legal conclusion of my brothers.

As the items admitted in evidence against the accused were obtained in the course of an administrative inventory, without the intervention of a showing of probable cause, I would reverse the decision of the board of review.