UNITED STATES, Appellee

v

TERRY W. UNRUE, Specialist Four, U. S. Army, Appellant

No. 26,552

September 21, 1973

*Captain Joseph J. Aronica* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Captain John D. Lanoue, Captain John Howard Shows,* and *Captain Howard M. Schmeltzer.*

*Captain William A. Kolibash* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Stan L. Spangler,* and *Captain Richard L. Menson.*

## OPINION OF THE COURT

QUINN, Judge:

Appellant contends that at his trial for wrongful possession of heroin the judge erroneously denied a motion to suppress cellophane packages of heroin found on his person during a search.

Colonel Latham was the Commanding Officer of the 197th Infantry Brigade which was stationed at Fort Benning, Georgia. The brigade occupied an area in the fort known as Kelly Hill. Some months previous to the search in issue, the incidence of drug use in the brigade rose "dramatically;" on the average, there were about 30 cases a quarter. In addition, brigade personnel were implicated in about 25 larcenies a quarter; in 100 percent of the "solved" cases of theft, the offender was involved with drugs. To counter these conditions and their consequences, Colonel Latham instituted a multifaceted program, which included more vigorous encouragement of recourse to the general amnesty policy for voluntary disclosure of drug involvement; the operation of an "extensive program" of education by lecture and demonstration by former drug users; and a roadblock inspection system whose execution was entrusted to Major Jarrell, the brigade intelligence officer, under a "mission order" to "prevent the introduction of narcotics into Kelly Hill."

The roadblock system utilized two roadblocks, or checkpoints, established on a random basis, on one or another of the roads on the post providing access to Kelly Hill. At the first checkpoint, vehicles were stopped, and a check was made of the driver's license and the vehicle's registration. No inspection was made of vehicle or person. However, all occupants were expressly advised to read a sign at the checkpoint. The sign measured about 5-½ by 3 feet and contained the following legend:

Attention, narcotics check, with narcotics dogs. Drop all drugs here and no questions asked. Last Chance.

A receptacle, described as an "amnesty" barrel, was located under the sign. A person manning the checkpoint informed all occupants of the vehicle that the vehicle would be stopped again at the second checkpoint, about 30 feet down the road. Everyone was given the opportunity to dispose of any drug in his possession, without "punitive action," by dropping it in the amnesty barrel before the vehicle moved on to the next stop. At the second checkpoint, under Colonel Latham's instructions, "vehicles and persons" were to be searched "if there was any indication of cause." To determine whether there was cause, a dog was walked around the vehicle, with the occupants still inside. The dog had been trained to "alert" to the odor of marijuana. If the dog alerted, the vehicle and passengers were searched; if it did not alert, the vehicle and occupants were allowed to proceed without further inspection.

The dog had two kinds of alert. One was called a "dead" alert, which meant marijuana had been present but removed, leaving only a residual odor to which the dog responded but as to which he could not fix an exact location. The second alert was characterized as a "true" alert because the dog's response indicated the physical presence of marijuana at a pinpointed location. Colonel Latham's instruction was that a search was to be made "if the dog alerts," without qualification as to the kind of alert. Previously, the colonel had witnessed "demonstrations specifically set up" to determine the dog's efficiency and reliability in the detection of marijuana, and he had seen the dog in "actual operation;" on each occasion, the dog had "found what was hidden." As a result, Colonel Latham concluded that the dog was "a primary device to determine probable cause" for search of a vehicle and its occupants at the second checkpoint of the inspection system.

On September 1, 1971, a roadblock was established on Marne Road, an access road to Kelly Hill. At approximately 11:30 p.m., a car, in which the accused was one of several passengers, stopped at the first checkpoint and went through the procedure described earlier. The vehicle and its occupants moved, without incident, from the first stop to the second checkpoint. At this stop were the dog, Rex, his handler, Staff Sergeant Ragan, Major Jarrell, and Major Curl, the Brigade Field Officer of the Day, who had come to witness Rex's performance. As soon as the vehicle stopped at the checkpoint, Rex alerted. With Rex, Ragan circled the car. Through the walkaround, Rex was in a true alert. Thereupon, the occupants of the car were asked to get out and step to one side, and remain in a group. Rex was allowed to put his head inside the vehicle, and he continued his alert, which indicated to Ragan "the area" of Rex's interest. Ragan "pushed the seat up" and found some fine vegetable matter on the carpet, and some "cigarette rolling paper." At Ragan's request, Major Jarrell authorized him to search the occupants. In the ensuing search of the accused, several packets of heroin were discovered in his wallet. It was these packets that the accused sought to keep from being introduced in evidence by the Government.

 The Fourth Amendment prohibits "unreasonable" search and seizure. It applies in the military as well as in the civilian community. As in the civilian community, therefore, the test of the legality of an intrusion by the Government into the individual's person or private effects is whether the action by the Government was, in the circumstances, reasonable. United States v Hartsook, 15 USCMA 291, 35 CMR 263 (1965); United States v Battista, 14 USCMA 70, 33 CMR 282 (1963). A search of one's person predicated upon voluntary consent is reasonable, whether or not there is probable cause to believe that evidence of a crime is present. Certain Army regulations provide for a search at the gateway to a military installation or facility, without regard to probable cause. A commander is authorized, for example, to search persons and vehicles upon their entry and exit from non-restricted areas, but the authority is circumscribed:

[If] a person refuses to be searched upon *entry,* he should not be searched over his objection but should be denied

access to the post. Searches of persons while on or upon leaving the installation may be made in accordance with paragraph 2-1, or .2-2 [those based upon probable cause and those conducted with a commander's prior authorization, e.g., search incident to a lawful apprehension, emergency situation, or those with consent of the individual to be searched and public areas] or upon military necessity. (Emphasis added.)

AR 190-22, paragraph 2-3*b*, June 12, 1970.[1]

A search elsewhere than at the gateway to designated areas must be justified by probable cause or other circumstances, such as military necessity, which demonstrate that the search is reasonable. See AR 210-10, paragraph 1-15*a*. The various regulations suggest that a general exploratory search on entry into a particular military area must rest upon consent. Here, the roadblocks were not set up at the gates of Fort Benning, or any other specially designated area, but were randomly maintained inside the post, and their purpose was to subject persons and vehicles to inspection, without consent. The roadblock system was not, therefore, sanctioned by any of the Army regulations cited to us or of which we are aware.

As there was no consent to the search, the question is whether the roadblock and the manner of its execution were otherwise reasonable and, therefore, constitutionally valid. The United States Supreme Court has recognized that in the discharge of its civilian functions, the Government may be required to institute a regulatory program, which for its proper effectuation utilizes an inspection system which may require limited intrusion into home or business without consent. Such intrusion is not violative of any justifiable expectation of privacy,

under the Constitution, on the part of the home or business owner. United States v Biswell, 406 US 311 (1972); Wyman v James, 400 US 309 (1971). This Court has recognized that in the discharge of its military functions, the Government, as represented by the military commander, may be required to maintain regulatory systems which necessitate inspection of persons and private effects without consent. The rubric that has been applied to such situations is "military necessity," but that is only another way of saying that the Government's action was, in the circumstances, reasonable.

Two kinds of military necessity situations relevant to this case are: (1) A search to protect the security of the command. United States v Brown, 10 USCMA 482, 28 CMR 48 (1959); see also United States v Gaddis, 41 CMR 629 (ACMR 1969); *cf.* United States v Poundstone, 22 USCMA 277, 46 CMR 277 (1973); (2) An administrative inspection to effectuate a proper military regulatory program. United States v Kazmierczak, 16 USCMA 594, 37 CMR 214 (1967).

As Judge Duncan perceives the facts, they demonstrate that the overriding purpose of the program was to uncover evidence of drugs inside Fort Benning without probable cause to believe that such substances were present on the person or in the vehicles searched.

■ In our opinion, the special impact of drug offenses, United States v Teasley, 22 USCMA 131, 46 CMR 131 (1973), and the special "odium" of larceny, United States v Thurman, 10 USCMA 377, 27 CMR 451 (1959), in the military community confronted Colonel Latham with conditions that posed a serious threat to the morale, capability, and health of the members of his command. Whether a condition is so epidemic as to necessitate Government action to counter the risk of harm that can result from continued

---

[1] AR 210-10, paragraph 1-15*a*, September 30, 1968, is substantially similar. It provides as follows:

Instructions of commanders regarding such searches should be specific and complete. Guards should be instructed that incoming persons should not be searched over their objection, but may be denied the right of entry upon refusal to consent to search. All persons entering facilities should be advised in advance (by a sign prominently displayed, AR 420-70) that they are liable to search upon entry, and while within the confines of the installation or upon exit (AR 190-22).

lack of control does not, in our judgment, depend upon the number of occasions the condition evidences itself. The ongoing program to prevent skyjacking illustrates our view. There, as here, the number of instances does not alone determine the danger and the need to oppose it. We regard the inspection system instituted by Colonel Latham for the purpose of keeping drugs out of his command as a proper regulatory program in light of the conditions. The means selected to effectuate the program demonstrate a concern that the inspection system, which was part of it, be as "carefully limited in time, place and scope" as the purpose of the system required and the effectiveness of the system necessitated. United States v Biswell, supra at 315.

■ No one subject to inspection incurred criminal liability at the first checkpoint. All were expressly informed that inspection would be made at the second checkpoint; and all were accorded the opportunity to dispose of any prohibited drugs in their control, with "no questions asked" and with no "punitive action." In our opinion, the Government's use of the dog to detect odors from the vehicle that a human inspector could not detect through his own sense of smell was not unreasonable.

In Katz v United States, 389 US 347 (1967), the United States Supreme Court held that an electronic device cannot be used by a Government law enforcement official to expand his sense of hearing to enable him to listen to words uttered by a suspect into the mouthpiece of a telephone in a public telephone booth. Since then, it has been suggested that no sort of a device can be used by an agent to enlarge the range of his senses beyond normal human limits. See Rintamaki, *Plain View Searching,* 60 Mil L Rev 25, 37-38 (1973): *cf.* United States v Loundmannz, 472 F 2d 1376 (DC Cir 1972). For purposes of this appeal, we assume that *Katz* erects a barrier against Orwellian surveillance that can result from indiscriminate and uncontrolled use by the Government of the myriad of devices which modern technology can provide to probe into the privacy of person and place. Perhaps *Katz* would prohibit the search of a pedestrian by a police officer on a public street in daylight hours solely because an x-ray device in a police van parked at the curb indicated that the passerby had a gun in a jacket pocket. At the same time, however, we have no doubt that *Katz* does not prohibit a police officer on a night patrol from using a flashlight to illuminate dark places on a public street in which a burglar might be lurking. See United States v Wright, 449 F2d 1355 (DC Cir 1971), *cert. denied,* 405 US 947 (1972). Whatever *Katz* may or may not enjoin in regard to augmentation of human senses, the rationalizing principle for any case of Government action that is opposed to the individual's claim of privacy is the constitutional standard of reasonableness; if what the Government agent does is reasonable, there is no violation of the Fourth Amendment. United States v Kazmierczak, supra. *Katz* affirmed "that the Fourth Amendment protects people" as well as places, but the privacy in which they are protected must be justifiable. 389 US at 353. By the time the vehicle reached the second checkpoint, the threat to any justifiable expectation of privacy as to odors emanating from it was just "not of impressive dimensions." United States v Biswell, supra at 317.

■ ■ Considering the proven capability of the dog to detect the odor of marijuana, his alert at the vehicle when it arrived at the second checkpoint provided, in our opinion, sufficient probable cause to search the occupants. *Cf.* United States v Ponder, 45 CMR 428, 434-35 (AFCMR 1972). See Lederer & Lederer, "Admissibility of Evidence Found by Marijuana Detection Dogs," *The Army Lawyer,* DA Pam. 27-50-4, at 12 (April 1973). True, heroin rather than marihuana was discovered on the accused's person, but evidence of a crime that is discovered in the course of a lawful search or inspection can properly be seized. United States v Kazmierczak, supra at 600. We conclude, therefore, that the heroin was not obtained from the accused in violation of the Fourth Amendment, and that it was properly admitted in evidence against him at trial.

Accordingly, the decision of the Court of Military Review is affirmed.

Chief Judge DARDEN concurs.

DUNCAN, Judge (dissenting):

Judge Quinn accurately states what I understand to be the basic relationship between the Fourth Amendment and persons in the military service. Included within his review is the principle that Fourth Amendment protection common to civilians also extends to our citizens in military service with the certain exceptions, one of which has generically been termed military necessity. The major reason for my reaching a decision different from the other court members is that they find the facts of this case sufficient to show a military necessity while I do not. Although Judge Quinn highlights my thinking in this regard, my position needs further clarification.

I

Today, the Court extends the limits of the scope of a search of persons and property beyond that provided for in paragraph 2-3*b*, AR 190-22, June 12, 1970:

> However, if a person refuses to be searched upon *entry*, he should not be searched over his objection but should be denied access to the post. Searches of persons while on or upon *leaving* the installation may be made in accordance with paragraph 2-1, or 2-2 [those based upon probable cause and those conducted with a commander's prior authorization, *e.g.*, search incident to a lawful apprehension, emergency situation, or those with consent of the individual to be searched and public areas] or upon military necessity. (Emphasis added.)

Paragraph 1-15*a*, AR 210-10, September 30, 1968,[2] contains a similar provision. I believe that it is reasonable to infer at the time of the promulgation of these regulations the Army was well aware of the general seriousness of the drug problem. Holding in mind the presumption that these regulations were carefully framed and implemented by informed and dedicated persons to meet the needs of the Army, can it be said that the facts of the case at bar are sufficient to display a problem so critical and unique as to allow a commanding officer of a brigade to withdraw rights that Army regulations clearly provide.

I believe the search here to be general in nature, nonconsensual, and not within the authority of either regulation referred to above. Prior to stopping the vehicle in which the appellant was riding, there was no probable cause to believe the vehicle contained, or its occupants possessed, narcotics. The roadblocks in the instant case were not established at the gates of Fort Benning but were inside the post. A close reading of these Army regulations indicates a purpose to authorize a search when an individual is coming on or going from an installation; other searches depend upon the existence of probable cause or a showing of military necessity. See paragraph 1-15*a*, AR 210-10.

According to a chart entered as Prosecution Exhibit 1, there were about 30 cases of drug use per quarter among personnel in the brigade. These data referred to cases "as recorded in military police files or in civilian police files downtown" and included "persons turning narcotics in—reporting themselves as being narcotics users." I do not intend to minimize the terrible harm that drugs have visited upon so many of our citizens both in and out of military service. One case of drug use is to be taken seriously; 30 cases per quarter most seriously. However, that is not the issue. Our examination must be to discover whether the Government produced sufficient evidence that the drug cases have endangered or reasonably can endanger the security of the command or the ability of the command to perform its mission. First, there is no direct evidence

[2] Instructions of commanders regarding such searches should be specific and complete. Guards should be instructed that incoming persons should not be searched over their objection, but may be denied the right of entry upon refusal to consent to search. All persons entering facilities should be advised in advance (by a sign prominently displayed, AR 420-70) that they are liable to search upon entry, and, while within the confines of the installation or upon exit (AR 190-22).

that the drug cases impacted upon the command in either of these respects. Quite obviously the loss of service of any member for any appreciable time because of drug use has some adverse effect upon the unit—30 such persons no doubt will cause more harm. Such evidence is distant from providing a basis for the inference that the security and performance of a brigade of more than 5000 men is jeopardized. Furthermore, the evidence does not discriminate concerning what sort of drugs were involved in the 30 cases. But to the extent that a problem of epidemic proportions alone will justify lifting Fourth Amendment protections, no such epidemic appears on the facts of this case.

Without laboring the point, the same lack of available facts from which inference of military necessity is found upon consideration of the 25 larcenies per month when in all solved cases (the facts do not reveal the number) the offender was involved with drugs. Viewed in total and not forgetting the insidious social and moral results of drug use and the drug culture, I find no reason to infer that the problem with drugs is more damaging to the 197th Infantry Brigade than the drug problem is within any other unit at Fort Benning, Georgia, West Germany, Vietnam, or any other military installation in the world. These facts simply do not justify sweeping away Fourth Amendment rights of those within the Kelly Hill areas while other men and women upon installations all over the world continue to enjoy these rights without the faintest showing that those on Kelly Hill are in any different class in this respect.

II

If there are sufficient facts to prove the existence of military necessity, then the search of the appellant and the others was without the protection of the Fourth Amendment. The extent of the actual intrusion in search for drugs was reasonable. The search was not physically shocking as was the search in Rochin v California, 342 US 165 (1952). Indeed, the very nature of drug possession where substances can be hidden in the smallest and least discernable places on one's person or property, demands a most extensive and thorough search.

After finding military necessity, which I do not, but the majority does, the discussion of the so-called "amnesty" barrel, the dog Rex, and custom's search are not really material. However, there are problems involved if there is any connotation that even absent facts showing military necessity that the facts show a permissible administrative inspection reasonable under the circumstances.

I would divorce the search in the instant case from those this Court has dubbed as an administrative inspection or "shakedown" which may be made without authorization to search and not upon probable cause. See my dissent in United States v Poundstone, 22 USCMA 277, 283, 46 CMR 277, 283 (1973). The appellant was a passenger in a private vehicle, apparently off-duty. Extending the inspection theory this far has the result of pragmatically doing away with the Fourth Amendment on Kelly Hill. If the search of this vehicle can be justified as an administrative search, using the same reasoning, I see no reason why a person could not be searched at any time or place in that area.

The use of the amnesty barrel deserves comment. Can one who disposes of drugs in the barrel be guaranteed amnesty? Perhaps a good argument can be made in bar of prosecution for possession prior to using the barrel by the commander of the brigade. But I am unable to see how the amnesty cover can insulate one from prosecution initiated by another person under paragraph 29b, Manual for Courts-Martial, United States, 1969 (Rev). Nor are there guarantees that the incriminating act of using the barrel will not be used against the person in other ways, for example, by identifying him as a drug abuser which would subject him to loss of privileges. See, e.g., VII Corps Cir 600-3, Alcohol and Drug Abuse Protection and Control (February 9, 1973). The use of such a barrel hopefully has aided in the control of the passage of drugs into the Kelly Hill area, but it is without any real legal impact. A person entering the area always could opt not wittingly to have

drugs in his possession. However, upon reaching the second roadblock, the record seems clear that those who were in possession of drugs risked prosecution. There seems to be no less risk of being prosecuted for drug possession at the second roadblock than experienced at any other place at Fort Benning. A realistic approach is that a search for drugs is for two purposes: (1) to interdict their flow; and (2) to expose their possessor to prosecution. Granting emphasis on the first cannot lessen the reality of the second.

Finally, the use of the amnesty barrel and the dog tend to frustrate the expressed purpose of the scheme. According to the prosecution Rex was so reliable that he would alert even though marijuana was not present at the time of the alert, but was present at a prior time.[3] The alert, however, would be the same. Rex would become hyperactive, whine, and paw. The only difference is that in a "true" alert, where marijuana is present, he would be able to pinpoint its location, while in a "dead" alert, where marijuana is no longer present, Rex would be unable to pinpoint its prior location. Thus, it would seem to follow that Sergeant Ragan and Major Jarrell could only guess as to whether the occupants had discarded the marijuana in the amnesty box or decided to take their chances with Rex. Major Jarrell testified, "We have had cases where individuals have thrown marijuana into the barrels, but the car is still searched."

Thus, since the stopping of the vehicle was without any reasonable belief that criminal activity was afoot, and was not within one of the exceptions to the requirement of probable cause, it was violative of the appellant's Fourth Amendment rights. Rex's alert and the discovery of cigarette paper, poppy seed, and fine vegetable matter could not lawfully form a basis for the appellant's arrest. Consequently, I would hold the heroin discovered on the appellant's person inadmissible. United States v Moore, 19 USCMA 586, 42 CMR 188 (1970); Wong Sun v United States, 371 US 471 (1963); Mapp v Ohio, 367 US 643 (1961).

---

[3] The brigade commander told Major Jarrell, "if the dog alerts, search." Apparently the search of the vehicle and all passengers would be conducted without regard to whether the alert were "dead" or "true."