LT Stephen R. Cochell, JAGC, USNR, Appellate Defense Counsel.

LCDR R. Clayton Seaman, Jr., JAGC, USN, Appellate Government Counsel.

## UNITED STATES

v.

**David C. VINCENT, 038 32 6173, Private First Class (E–2), U.S. Marine Corps.**

**NMCM 82 1203.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 23 June 1981.

Decided 22 Dec. 1982.

Before GORMLEY, Senior Judge, and MAY and GARVIN, JJ.

PER CURIAM:

For the reasons set forth in the concurring/dissenting opinion, the findings of guilty as to Charge I and the single specification thereunder are set aside. Charge I and the specification thereunder are dismissed. The findings as to Charge II are affirmed. This action necessitates reassessment of the sentence. Upon reassessment, the sentence as adjudged and approved on review below is affirmed.

MAY, Judge (concurring/dissenting):

Appellant was convicted, contrary to his pleas, by special court-martial, officer members, of larceny of a camera and possession of marijuana in violation of Articles 121 and 92, Uniform Code of Military Justice (UCMJ) 10 U.S.C. §§ 921 and 892. He was sentenced to be discharged from the naval service with a bad-conduct discharge, confinement at hard labor for a period of 90 days, and reduction to pay grade E–1. The findings and sentence were approved on review below.

Appellant assigns five errors, four of which I find to be without merit. I do find merit in the following assignment:

## II

### THE "INSPECTION" CONDUCTED PURSUANT TO MRE 313(B) WAS A SUBTERFUGE SEARCH.

I have extracted from the record of trial the following sequence of events considered relevant to this issue:

20 April 1981: Commanding Officer (CO) of HMT–204, Lieutenant Colonel [C], is informed by squadron sergeant major that a newly assigned Marine had requested a room transfer because he didn't want to be involved with the marijuana use engaged in by his roommates. The identity of the roommates was determined by the CO. One of the suspected marijuana users was a crew chief in flying status and the other suspected user was a Corporal [R], previously implicated in marijuana use. Appellant's name was not mentioned as one of the Marines involved in specific marijuana use, although his name was linked to one of the rooms involved in the complaint or as an adjoining room occupant.

Lieutenant Colonel [C] placed the complaining Marine under oath during his inquiry regarding the suspected marijuana smoking. The squadron executive officer, Major [N], was present during the inquiry in which the complaining Marine identified the two suspects: an aircraft crew chief [name unknown] and Corporal [R]; and the numbers of the two barracks rooms involved.[1]

Following the conversation with the complaining Marine, Lieutenant Colonel [C] directed that the Executive Officer, Major [N], supervise the conduct, by the squadron duty officer, of "inspections" of the two rooms assigned to the two suspects, plus two other rooms selected by the executive officer. The "inspection" of this set of four rooms was to be conducted the same evening, 20 April 1981, and with subsequent inspections several days apart of "any four rooms at random."

*Extracts from Lieutenant Colonel [C]'s testimony:*

"A. [I] told my executive officer to take the two rooms that this Marine had mentioned, add two more to it and have the duty officer go ahead and search those four rooms, in succeeding nights, wait two or three days, pick any four rooms at random and start doing that on a routine basis. We had the first search, it was on the night in question, and we had a second one about three days later, the following weekend we had the dogs in the barracks, and they turned up one seed, and so I figured I would relax the searches at that point again.

"Q. Why four, is that any magic number associated with four rooms?

"A. No, I didn't want to pick out one room and have them go straight to one room because I might put—end up putting that young Marine—that's putting his roommates on report, they might be able to find out that the source of the information as to why we were searching not more than one room, and I had not done random searches in the past, so if all of a sudden the duty officer came screaming up, walks into the room to conduct the search, it would be obvious as to what he was doing at—

---

1. The record does not reveal the specific room numbers assigned to the two suspected marijuana users. These rooms were apparently two of the three rooms numbered 329, 330, 331.

Room 332, assigned to appellant, was apparently not assigned to either of the two suspected marijuana users, but was located immediately adjacent thereto.

"Q. At that time, sir, did you have any suspicion that PFC VINCENT was involved with drugs?

"A. I had reason to believe, based on his past record, that he was involved with drugs. He was going through drug and alcohol counseling at that time.

. . . .

"Q. Was PFC VINCENT the object of the search?

"A. No, he was not.

"Q. And how was his room selected, sir?

"A. His room number was mentioned as one of the rooms that the people who were smoking either in the room where the Marine lived or the adjoining room.

. . . .

"Q. Sir, what was your primary purpose in ordering all these inspections of rooms?

"A. To get the stuff out of the barracks and put people on notice that we were going to be inspecting randomly, unannounced, and in the evening from now on. Then the secondary reason was to get the crew chief, if in fact he was smoking, and to find out whether or not Corporal [R] was lying to me, if in fact he was smoking; and if he was lying to me, I wasn't going to go to battle for him.

. . . .

"Q. You indicated, I think, sir, on direct testimony that you had picked two rooms out, and then you asked that two more be added to it, is that correct, sir.

"A. That's correct.

"Q. Was it your intention at that time just to have a random inspection of the barracks; just pick rooms out of . . .

"A. The other two rooms to be picked at random by my executive officer, I gave him the first two rooms.

. . . .

"Q. Very well. Sir, do you recall what two rooms you had targeted as the . . .

"A. No idea. They were the two rooms that were specifically mentioned by this Marine. I had notes on my desk at the time and I gave him those two room numbers.

. . . .

"Q. Sir, did you give any instructions as to what was to be done during the course of an inspection of a room, what the duty officer was supposed to do once he gained entrance?

"A. No—Yes, I told him to just go in there, if there was any smoking going on, go ahead and shake the room down. Notify me, and I would go ahead and authorize a search. If there was nothing going on, the people were sleeping, and the lights were out, the music was off, just close the door. It was not intended to be a complete search. It was just a spot check for marijuana smoking after taps.

. . . .

"Q. What was your direction, sir, if they didn't perceive any marijuana smoking; what were they to do at that time?

"A. I don't think I gave any direction. I may have left it to my executive officer to—I don't know, I was not clear-cut as to what was to be done each step of the way. I wanted to put people in the barracks on notice that there was going to be random searches, and that was basically it.

. . . .

"Q. And you never personally spoke with the Staff Duty Officer and told him what information you had gathered from your sworn witness, is that correct, sir?

"A. Squadron Duty Officer?

"Q. Yes, sir?

"A. No, no, I didn't.

"Q. Did you ever communicate that information to the executive officer?

"A. Yes, what I got from the informant?

"Q. Yes, sir?

"A. I believe the executive officer was in the room at the time that the informant was there.

"Q. You indicated that you had known that PFC VINCENT had had some past involvement with marijuana, is that correct, sir?

"A. Yes.

"Q. In fact, you had given him office hours back in January, is that correct, sir?

"A. That's correct."

1900, 20 April 1981: Executive officer telephones First Lieutenant [D], squadron duty officer, and ordered him to "inspect" rooms numbered 329, 330, 331, and 332, after 2200 that evening.

2320, 20 April 1981: Lieutenant [D] accompanied by the squadron duty noncommissioned officer, Sergeant [H], successively knocked on the door of rooms 329, 330, and 331, opened with a pass key the door to those rooms, observed that the occupants were apparently asleep, and left these rooms without any "inspection". Upon arriving at room 332, appellant's room, the duty officer noted that the lights were on, knocked, then opened the door. The duty officer and Sergeant [H] observed three Marines: appellant, Corporal [R], and Private First Class [B], seated around a desk. The duty officer observed a smoky haze in the room and an open film canister on the desk with a green—leafy substance inside the canister. First Lieutenant [D] seized the canister and its contents. The contents ultimately were the basis of the marijuana possession charge against appellant.

*Extracts from Lieutenant [D]'s testimony:*

"Q. And during the course of your duties as SDO, did you have the opportunity to conduct a search of PFC VINCENT's room?

"A. Yes, sir, we did.

"Q. And can you tell us what the circumstances were?

"A. I was instructed by the Squadron Executive Officer, Major [N], to inspect the rooms numbered 329, 330, 331, and 332, after 2200 at night.

"Q. And is one of those four rooms PFC VINCENT's room?

"A. PFC VINCENT's room is 332.

. . . .

"Q. And more specifically, now what happened with relationship to any inspection— let me start that—let me go back for a minute. Do you know why you were told to inspect those rooms?

"A. No, sir.

. . . .

"Q. And, again, what were you going to enter his room for at this time?

"A. We were instructed to inspect those following rooms, 329, through 332, at the XO's instructions. He said he had some suspicions, that was all, he didn't mention anything else.

"Q. Did he tell you what kind of suspicions he had?

"A. No, sir, he didn't.

. . . .

"Q. Did you have an occasion to make an annotation on a piece of paper that may have described what you thought that authorization was?

"A. Not that I recall, sir.

"Q. Let me show you Appellate Exhibit I, and ask you to look on the back page, specifically about the 3d sentence down after the time and date. Does that refresh your memory as to what you thought you had from the XO at that time?

"A. Yes, sir.

"Q. What does that say?

"A. It says search authorization.

"Q. Very well, (witness hands exhibit back to the defense counsel), and during your telephone call with the executive officer was it at this time that he communicated to you that there was a suspicion that there might be something to find in PFC VINCENT's room?

"A. He only said a suspicion in those four rooms. He didn't specify which room.

. . . .

"Q. And have you ever done this kind of thing before?

"A. No, sir.

"Q. Have you ever done it since?

"A. No, sir.

"Q. It was only this one time that you done it?

"A. That is correct, sir.

"Q. When you spoke with the Executive Officer, did he tell you when he wanted you to make this inspection?

"A. He said—yes, sir, sometime after 2200.

"Q. When you spoke with the Executive Officer, did he tell you what you were to look for?

"A. No, sir.

"Q. Did he tell you what sort of items you were supposed to seize?

"A. He said any uncontrolled—or controlled substances, if I found those in the room.

. . . .

"Q. And you didn't have any idea that there was a controlled substance in that room until after you had entered and looked and saw the open vial?

"A. That is correct.

"Q. You had no reason to believe there was anything in there when you opened the door, is that correct?

"A. That's correct.

"Q. Although the XO had his suspicion and he communicated that suspicion to you?

"A. Yes, sir."

Appellant now challenges the conduct of the Government seizure, contending that a subterfuge search without appropriate search authorization or exigent conditions was, in fact, conducted. The Government's response is that an inspection in accordance

2.  Rule 313(b):

    *Inspections.* An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to lo-

with the provisions of Rule 313, Military Rules of Evidence,[2] was conducted.

I have examined the record of trial and particularly those extracts of the testimony herein reproduced. It is evident in my view that here the commanding officer was justifiably concerned with the safety, readiness, and fitness of his command, an operational training squadron preparing pilots to operate tactical aircraft. Certainly an inspection focused upon the location and confiscation of prohibited narcotics substances is permitted in accordance with Rule 313. What is not permitted, however, under the Military Rules of Evidence is a command "search" cloaked under the characterization of necessary and reasonable administrative inspections.

Certainly Lieutenant Colonel [C], the squadron commanding officer, could have authorized and ordered an inspection of the rooms occupied by his personnel after 2200 in the evening in the furtherance of his command responsibilities. He would not have been precluded under the Military Rules of Evidence from establishing a procedure involving blocks of four rooms inspected at preestablished intervals. I do not find that any constitutional prohibition overrides or bars inspections of military barracks when conducted in accordance with Rule 313(b). *See Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 609, 62 L.Ed.2d 540 (1980); *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975);

cate and confiscate unlawful weapons and other contraband when such property would affect adversely the security, military fitness, or good order and discipline of the command and when (1) there is a reasonable suspicion that such property is present in the command or (2) the examination is a previously scheduled examination of the command. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion and shall comply with rule 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.

*G.I. Rights v. Callaway,* 518 F.2d 466 (D.C. Cir.1975); *United States v. Hessler,* 7 M.J. 9 (C.M.A.1979).

The touchstone, however, in according to the military commander an appropriate vehicle for the maintenance of operational efficiency, safety, and unit integrity, is that the inspections thereby authorized not have, as a *primary purpose,* the gathering of admissible evidence for disciplinary proceedings. Mil.R.Evid. 313(b). The Government here contends that the primary purpose for the commanding officer in this case was to identify and consider for appropriate reassignment those persons whose narcotics use or possession hazarded the command or rendered the individual Marines involved unfit for the critical demands of duty related to aircraft operations. In the Government's view, the imposition of disciplinary proceedings was not a primary purpose of the "inspections" of 20 April 1981, but was an incidental, but necessary, responsibility of command when a contraband substance was discovered during the course of the scheduled "inspection".

I do not agree. From my examination of the testimony of the squadron commander, Lieutenant Colonel [C], I find that the activities ordered and carried out by the squadron duty officer on the evening of 20 April 1981, were, whatever their characterization, activities whose primary purpose was the gathering of evidence for disciplinary proceedings. That need not render as unlawful, the command activities related to the two suspects, the crew chief, and Corporal [R]. It is highly possible from the limited evidence on the record, that Lieutenant Colonel [C] had sufficient probable cause to have authorized a search of the rooms assigned to the two Marines identified by the informant. *United States v. Fimmano,* 8 M.J. 197 (C.M.A.1980); Mil.R.Evid. 315. As to appellant's room, however, neither proba-

ble cause in accordance with Rule 315(f), Military Rules of Evidence; exigent conditions, Rule 315(g); nor conditions authorizing searches without probable cause, (*i.e.,* entry searches; consent searches; search incident to lawful apprehension, Rule 314, Military Rules of Evidence), was applicable.

Appellant's name had apparently been referred to, tangentially, in the informant's statement. He apparently, however, was not the primary focus of the squadron commander's "inspection" order. If, in fact, an order had been issued to conduct late evening inspections of four rooms on preestablished schedules, until the entire squadron had been the subject of such reasonable command intrusions, appellant's present contention of unlawful search would be without merit. Here, however, I am inescapably faced with activity aimed at garnering evidence. Appellant had previously been the subject of disciplinary proceedings involving marijuana. Appellant's name was mentioned by the informant during the inquiry conducted by the squadron commanding officer, with the executive officer, Major [N] present. The executive officer subsequently included appellant's room in his "inspection" order to the duty officer.[3]

I cannot, given the paucity of direction given by the squadron commanding officer to his subordinates, distinguish between the motivation underlying the entrance into the rooms of the two suspected drug offenders and that accompanying the intrusion into the immediately adjacent two rooms, the last being assigned to the appellant. Certainly in my view an "inspection" in accordance with Rule 313(b), Military Rules of Evidence, should encompass the following elements:

1. A primary purpose clearly related to the maintenance of unit security, fitness for duty and mission, or the necessary

---

**3.** I am also troubled by the range of discretion granted by the squadron commander here to the executive officer and the duty officer. It is apparent that no standard approach or scope of the activity was established by Lieutenant Colonel [C]. *See United States v. Harris,* 5 M.J. 44 (C.M.A.1978). When the uniformity of such "inspections" decreases as the command-

er's order moves down the chain of command, it is also likely that unbridled discretion will be exercised in an unlawful manner by those supposedly carrying out the initially reasonable and limited intrusion orders of a commanding officer. Here, it is clear that no uniform approach was dictated by the commanding officer or carried out by the duty officer.

level of good order and military discipline.

2. An established unit inspection directive containing:

(a) A preestablished schedule established by the commanding officer. It is not necessary that this schedule be promulgated, but it should be known by the unit commanding officer and executive officer in advance of any actual inspections. This preestablished schedule should contain:

(1) A specific and detailed inspection routine, providing inspection personnel with the scope and range of inspection efforts, i.e. wall lockers, uniforms, clothing, equipment, desks, furniture storage compartments, etc.

(2) Specific and detailed procedures for the handling and seizure of contraband material, including advisement of rights if any interrogation of suspected offenders is contemplated.

I believe that our operating forces are sufficiently acquainted, or should be, with the Military Rules of Evidence to avoid the generally uncontrolled and certainly unreasonable manner in which this unit conducted this "inspection". No member of this Court fails to appreciate the awesome responsibility presently laid, as it has always been, on the shoulders of the unit commander. Coupled with the responsibility is, of course, a significant grant of power and command prerogative. With such command prerogatives must concomitantly exist practices and policies controlled by constitutional, statutory, and executive law.

Every unit commander possesses the ability to request, if necessary, the recommendations or staff assistance of command judge advocates in the development of appropriate and lawful procedures in the furtherance of good order and discipline and the maintenance of effective mission capability. The judge advocates serving with our operating forces also bear a responsibility to insure that understanding of military justice procedures exists among our line unit commanders.

Here I find that the trial judge erred when he found the activities herein described were appropriate and lawful inspection activities in accordance with Rule 315(b), Military Rules of Evidence. I do not agree with the trial judge's view that the primary purpose of the examination activities ordered by the squadron commanding officer here was the maintenance of unit fitness and mission readiness. I find, instead, that the primary purpose of the examination activities was the obtaining of evidence for use in disciplinary proceedings. Article 66, UCMJ, 10 U.S.C. § 866. I further reject the Government's contention that the seized narcotic substance is admissible under the "plain view" doctrine. It is obvious that the observation of the contraband narcotics was the intentional, rather than inadvertent, result of the duty officer's entrance into appellant's room. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

As the contraband seized was not admissible under any of the relevant provisions of Rules 313, 314, or 315, Military Rules of Evidence, the suppression motion entered by appellant should have been granted. Mil.R.Evid. 311. *See United States v. Lange,* 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965). I conclude that the findings as to Charge II are correct in law and fact.

On its face, the remaining sole conviction for larceny would appear to represent an offense of sufficient qualitative character to permit reassessment of sentence by this Court. *United States v. Stene,* 7 U.S.C.M.A. 277, 22 C.M.R. 67 (1954). The circumstances of this larceny offense, in my view, however, appear to present sufficient grounds that argue, in the interests of justice, for a determination, at the trial level, of an appropriate sentence. Appellant was found in possession of the camera previously reported stolen. He contended at trial that he had purchased the item from another Marine identified as "Smith", an interesting, if less than original, identification element. The record reflects little effort on the part of appellant to conceal his newly acquired camera. Certainly there appears to be sufficient evidence on the record re-

garding access to the victim's room, as well as the credibility assessment of the Government's witnesses versus the testimony of appellant, from which the triers of fact could arrive at findings of guilty as to the larceny charge and reject a companion charge alleging the purchase and concealment of stolen property.

I am not convinced, however, that the triers of fact in considering an appropriate sentence here would have sentenced appellant to a punitive discharge under the circumstances of this case. *See Stene, supra; United States v. Voorhees,* 4 U.S.C.M.A. 509, 16 C.M.R. 83 (1954). Therefore, I would return the record of trial to the Judge Advocate General of the Navy for transmittal to the convening authority for rehearing on the sentence. I dissent, therefore, from my Brothers' decision to reassess the sentence.