**UNITED STATES, Appellant**

v.

**Specialist Five John C. AUSTIN, 276–56–1417, United States Army, Appellee.**

**Miscellaneous Docket No. 1985/15.**

U.S. Army Court of Military Review.

6 Nov. 1985.

For Appellant: Major Ernest F. Peluso, JAGC (argued). Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Lieutenant Colonel Joseph A. Rehyansky, JAGC (on brief).

For Appellee: Captain Craig E. Teller, JAGC (argued). Lieutenant Colonel Paul J. Luedtke, JAGC, Major Eric T. Franzen, JAGC (on brief).

Before YAWN, WILLIAMS, and KENNETT, Appellate Military Judges.

## OPINION OF THE COURT

WILLIAMS, Judge:

Pursuant to Article 62 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862, and in accordance with Rule for Courts-Martial (RCM) 908, Manual for Courts-Martial, United States, 1984, the government appeals the decision of the military judge suppressing evidence derived from a test of the urine of Specialist Five (SP5) Austin.

On 2 August 1985, the military judge conducted a pretrial Article 39(a), UCMJ, 10 U.S.C. § 839(a), session. The purpose of the pretrial hearing was to litigate a suppression motion made by appellee. The appellee asserted the results of a urinalysis test were inadmissible evidence because the urine sample taken from him was taken in violation of Military Rule of Evidence (Mil.R.Evid.) 313.

In response to SP5 Austin's assertion, the government called Captain (CPT) Vickers, Austin's company commander, to testify. Captain Vickers stated that in January 1985, he had spoken with his battalion commander, Lieutenant Colonel (LTC) Tonsetic, concerning drug use within CPT Vickers' company. More specifically, LTC Tonsetic told CPT Vickers an individual had reported that drill sergeants[1] in the company were using drugs. Lieutenant Colonel Tonsetic suggested that CPT Vickers schedule a unit urinalysis. Within two to three days after his discussion with LTC Tonsetic, CPT Vickers scheduled a unit urinalysis. However, because of a scheduling backlog, the earliest possible date for the unit urinalysis was 5 March 1985. When asked what his "primary purpose" for scheduling the urinalysis was, CPT Vickers alternately stated: (a) to find users and initiate disciplinary proceedings against those soldiers who tested positive; (b) to comply with the requirement that a unit urinalysis be conducted yearly; and, (c) to insure safety within his unit. Trial defense counsel also

submitted for the trial judge's consideration several sworn statements signed by CPT Vickers. Those statements set out that CPT Vickers' primary purpose in scheduling the unit examination was to take disciplinary action against any individual who tested positive.

Following CPT Vickers' testimony, the military judge called LTC Tonsetic to testify. Lieutenant Colonel Tonsetic confirmed he had spoken with CPT Vickers and had informed CPT Vickers of possible drug use by drill sergeants in his unit. Lieutenant Colonel Tonsetic also said although he had not ordered CPT Vickers to schedule the unit urinalysis, he had "strongly influenced him to do it."

Following presentation of evidence and argument by counsel, the military judge entered specific findings of fact. In pertinent part, the military judge found, as a matter of fact:

> With regard to the request for findings, the facts submitted by the defense as an attachment to Appellate Exhibit XV, I find that Captain Vickers' primary purpose in ordering the 5 March 1985 unit sweep urinalysis was to ascertain which individuals, if any, in his company were abusing marijuana. ... In the sense that that report was the occurrence which generated the 5 March 1985 unit sweep, I find that Captain Vickers did specifically contemplate disciplinary action against individuals identified as positive on the 5 March 1985 unit sweep urinalysis.

The military judge, based on his determination concerning CPT Vickers' primary purpose and the application of Mil.R.Evid. 313(b); ruled the inspection was invalid and evidence obtained by the inspection was inadmissible.

Trial counsel immediately requested a delay, pursuant to RCM 908, to determine whether the government would appeal the judge's order.[2] Later the same day, the

---

1. Appellant was assigned as a cook.

2. Trial counsel requested the charges be severed and the trial proceed. Specialist Five Austin refused to agree to a severance. The military judge, based on RCM 908(b)(4)(B), denied the government's request.

court reconvened and government counsel requested, pursuant to RCM 918, that the military judge make special findings. The trial counsel pointed out that the judge earlier had made a finding of fact that CPT Vickers' primary purpose in ordering the urinalysis was to identify drug users. Trial counsel requested that the judge enter findings as to why CPT Vickers wanted drug users identified. The military judge responded:

> My finding as was indicated in response to the defense request for findings was that Captain Vickers' primary purpose was to identify drug users within his unit. As I indicated in my observations in the analysis of the issues that were presented, I don't find it surprising or necessarily determinative that Captain Vickers stated his purpose in the order that he did, but my understanding would be that he—that first, his purpose was to identify drug users within the unit. As I indicated, I find that to be consistent with the notion of a urinalysis. In other words, that's what the urinalysis is designed to do. And secondly, that he intended to take some sort of dispositive action with regard to those individuals, whether that be punitive action or whether it be adverse administrative action. Captain Vickers stated that he had a concern about the safety of the unit and that was elaborated on in direct examination with regard to the basic training atmosphere and the responsibility of the permanent party members of his unit towards basic trainees and towards their safety. My understanding is that even on direct examination the import of the testimony was that safety came next. So I suppose if I'm going to order those in the order that Captain Vickers stated them in, and I have no reason to believe that his thought process was otherwise, they would be first to identify individuals; secondly, to take some sort of action against those individuals; and third, safety of the unit.

> \* \* \* \* \* \*

> But my findings would be that those— the purpose of Captain Vickers was expressed as being three different things and they were communicated in that order that I gave them in. First, to identify users; secondly, take some action against the users and third, perhaps "thereby" would be an inappropriate linking phrase, but thereby protect the safety of his unit.

> \* \* \* \* \* \*

> Consequently, that the primary concern was to identify users.

> \* \* \* \* \* \*

> The secondary concern was to take some action against them. Now, as I indicated, he testified about his safety concern and he testified—the context of his testimony about safety may lead to the conclusion that he was effectuating safety by doing the first two, but I don't want to read too much into his subjective intent, and as I indicated, it seems to me that he gave an order—he gave an order on direct examination—in terms of what his thought process was, that first, his primary concern was to identify users. Then he wanted to take action against individuals and then next was safety. I think he reiterated that on cross-examination, and that's what I find.

■ Military Rule of Evidence 313(a) provides that evidence obtained from inspections in the military is admissible so long as the inspection is conducted in accordance with the rule and is not otherwise inadmissible. This rule carves an exception in the traditional Fourth Amendment requirement that governmental intrusions be grounded on probable cause. The rule recognizes inspections are justified by "the exigencies of military necessity and unique conditions that exist within the military society." *See United States v. Middleton,* 10 M.J. 123, 126 (CMA 1981). These inspections are typically designed to ascertain the health, welfare, morale, state of readiness, and living conditions of unit members. In light of these important concerns, commanders typically have broad authority to conduct such inspections. Be-

cause the use of drugs by soldiers is diametrically opposed to the above stated interests, the drafters of the rules of evidence recently amended Mil.R.Evid. 313 and specifically indicated they intended the rule apply to an order to produce body fluids.

The term "inspection," however is a term of art. Military Rule of Evidence 313(b) specifically defines an inspection:

An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband. An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an in-

spection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion and shall comply with Mil.R.Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.

In this case, attention must be focused on the fifth sentence of that definition. Specifically, "[a]n examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule." Mil. R.Evid. 313(b).

 The "purpose" analysis set out in Mil.R.Evid. 313(b) is not novel. Even pre-rule cases discussing the crucial distinction between a permissible inspection and a search have focused on the primary purpose behind the examination. In *United States v. Coleman*, 32 C.M.R. 522 (ABR 1962), the board opined that "the distinguishing feature requiring early recognition is the *purpose* involved." *Id.* at 524 (emphasis added). *See also United States v. Lange*, 15 C.M.A. 486, 35 C.M.R. 458 (1965); *United States v. Hay*, 3 M.J. 654 (ACMR 1977). If, however, there are mixed purposes behind the examination, the primary one being other than to gather evidence for disciplinary action, the evidence may be used in a later disciplinary proceeding. *United States v. Barnett*, 18 M.J. 166 (CMA 1984); *United States v. Law*, 17 M.J. 229 (CMA 1984). Whether the primary purpose of the inspection was aimed at legitimate administrative concerns versus implemented with a view toward discovering evidence to be used in a disciplinary proceeding is a factual question to be resolved by the military judge. *Barnett*, 18 M.J. at 171; *United States v. Wade*, 15 M.J. 993, 998 (NMCMR 1983); *Lange*, 35 C.M.R. at 463 (Quinn, J., dissenting) (question of purpose of inspection was for law officer's determination). *See also United States v. Yingling*, 20 M.J. 593, 594

(NMCMR 1985). The military judge recognized the purpose of instituting a unit urinalysis was to identify drug users. The military judge then made a factual determination that the primary purpose for the examination, after locating drug users, was to initiate disciplinary actions.

■ Article 62, UCMJ, specifically dictates, when the government appeals a decision of the trial judge, this court "may act only with respect to matters of law." Here, the judge's decision to suppress the evidence was based on a specific finding of fact. We can, therefore, reverse his decision only if his factual finding was erroneous "as a matter of law." Based on our analysis of the proper standard of review under Article 62, UCMJ, we decline to reverse the judge's decision.

■ Several recent opinions have discussed Article 62, UCMJ, appellate review of findings of fact. In *United States v. Lewis*, 19 M.J. 869, 870 (AFCMR 1985), the Air Force Court of Military Review reviewed a trial judge's decision that defects in the chain of custody of a urine sample rendered the results inadmissible. The court held that such findings of fact may not be disturbed on appeal unless the findings "are wholly unsupported by the evidence." *Id.* *See also United States v. Browers*, 20 M.J. 542, 549 n. 5 (ACMR 1985), *rev. on other grounds*, 20 M.J. 356 (CMA 1985); *United States v. Poduszczak*, 20 M.J. 627, 631 (ACMR 1985). Other decisions speak in terms of overturning factual determinations only if the reviewing court finds an abuse of discretion by the trial judge. *Yingling*, 20 M.J. at 594; *United States v. Burris*, 20 M.J. 707, 709 (ACMR 1985). We, however, prefer to utilize a standard of review consistent with that applicable to government appeals in the federal civilian system.

■ Article 62, UCMJ, was intended to parallel, to the extent practicable, 18 U.S.C. § 3731(1984), which permits appeals by the United States in federal civilian prosecutions. *See* S.Rep. No. 98–53, 98th Congress, 1st Sess. 23 (Military Justice Act of 1983) (statement of William Taft IV, General Counsel of the Dept. of Defense); The Military Justice Act of 1980. Hearings on S. 2521 Before the Subcomm. on Manpower and Personnel of the Senate Comm. on Armed Services, 97th Cong., 2d Sess. 33, 46 (1982) (statement of Major General Hugh J. Clausen, The Judge Advocate General, U.S. Army). The standard of review of factual findings under the federal provision is well settled. A finding of fact "may be overturned *only if clearly erroneous." United States v. Posner*, 764 F.2d 1535, 1537 (11th Cir.1985) (government appealed district court judge's ruling concerning the admissibility of a letter of a co-conspirator. The district judge had suppressed the letter.) (emphasis added). *See also* Hall, *Search and Seizure* § 27:4 (1982 & Supp. 1984). Thus, a factual finding made by a trial judge is incorrect as a matter of law only if the finding is clearly erroneous.

The remaining issue to resolve concerns the definition of the standard now adopted. Federal Rule of Civil Procedure 52(a) says "findings of fact shall not be set aside unless clearly erroneous...." Although rule 52(a) is a rule of civil procedure, the clearly erroneous standard which it sets forth has been applied in criminal proceedings. *United States v. Page*, 302 F.2d 81 (9th Cir.1962) (en banc); *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Although different terminology has been used, *see e.g., Cleo Syrup Corp. v. Coca-Cola Co.*, 139 F.2d 416 (8th Cir.1943), *cert. denied*, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944) (will not set aside finding of fact unless there is no substantial evidence to sustain it or unless it is against the clear weight of the evidence); *Shapiro v. Rubens*, 166 F.2d 659 (7th Cir.1948) (will not disturb findings unless they cannot be sustained upon any rational view of all of the evidence); *Smith v. James Irvine Foundation*, 402 F.2d 772 (9th Cir.1968), *cert. denied*, 394 U.S. 1000, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969) (we are not to retry the issues of fact nor supplant the district court's judgment with that of our own), the tenor of the decisions is the

same—that is, unless the trial judge's findings of fact are not supported by the record, we will not substitute our opinion for the judge's. This formulation is consistent with both the "wholly unsupported" analysis,[3] *Lewis,* 19 M.J. at 870, and the traditional view that the finder of fact is in a superior position to observe witnesses' demeanor and accept or reject their testimony. *See United States v. Frierson,* 20 C.M.A. 452, 454, 43 C.M.R. 292, 294 (1971); *United States v. Albright,* 9 C.M.A. 628, 631, 26 C.M.R. 408, 411 (1958). Here, we cannot say the trial judge's findings were clearly erroneous.

Accordingly, the appeal of the United States is denied. The record is remanded for further proceedings.

Senior Judge YAWN and Judge KENNETT concur.

---

**3.** *See also Commonwealth v. Iannaccio,* 304 Pa. Super. 307, 450 A.2d 694, 698 (not bound by a court's finding of fact if the finding is wholly lacking support in the record).