UNITED STATES, Petitioner,

v.

Manley Burt WADE, Captain, Judge Advocate General's Corps, U.S. Navy, Military Judge, Respondent.

Misc. Dkt. No. 82–19.

U. S. Navy-Marine Corps Court of Military Review.

24 March 1983.

LCDR David S. Durbin, JAGC, USNR, Appellate Defense Counsel.

LT W. David Paxton, JAGC, USNR, Appellate Government Counsel.

LT William V. Cerbone, JAGC, USNR, Appellate Government Counsel.

BARR, Judge:

The United States has petitioned the Court to issue a writ of mandamus compelling the Respondent military judge, Captain M. Burt Wade, JAGC, USN, to reverse his holding in the case of *United States v. Vining,* that Rule 312(d) Mil.R.Evid. mandates the suppression of laboratory results of a urine sample obtained as a result of a compulsory unit-wide urinalysis "inspection."

On 27 July 1982, the Commanding Officer, Naval Air Station, Cecil Field, Florida, pursuant to prior existing guidelines, requested authorization from his second-echelon commander, Commander-in-Chief, U.S. Atlantic Fleet, (CINCLANTFLT), to conduct a unit-wide urinalysis sweep of the four hundred persons, officer and enlisted, assigned to his Air Intermediate Maintenance Department (AIMD). The purpose, as stated by the command, was to enhance maintenance safety by identifying drug users, to determine the scope of drug involvement within the department and thereby assist in determining remedial actions, and to demonstrate the command's lack of tolerance for drug involvement. On 16 August 1982, CINCLANTFLT granted the requested permission.

On 8 September 1982, all personnel attached to AIMD, Naval Air Station, Cecil Field, were required to, and did, provide an individual sample of urine for broad spectrum analysis to detect the presence of contraband drugs. AT2 David W. Vining, USN, the real party in interest, was attached to AIMD during the month of September 1982, but was unavailable for the specimen collection on 8 September. On 17 September, Vining provided a sample as part of the unit-wide sweep, which sample was subsequently identified as testing "positive" for the presence of the controlled substance cocaine. At the time this sample was provided, no probable cause existed to believe that Vining had committed an offense, nor was there probable cause to believe that evidence of an offense would be found in his sample. The above recited facts were stipulated to by the parties to the judicial proceeding below.

When Vining elected to refuse nonjudicial punishment,[1] the Commanding Officer, NAS Cecil Field convened a special court-martial and, on 14 October 1982, referred to the court a single Charge, supported by two specifications, alleging possession and use of cocaine, in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892. During an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session conducted on 9 December 1982, Vining, through counsel, moved to suppress the laboratory results of the urine sample, and all derivative evidence, on the ground that the collection of the urine specimen was unlawful for failure to comply with Rule 312(d), Mil.R.Evid. The Government argument in support of admissibility of the test results was that the sample was obtained pursuant to a valid command-directed inspection under Rule 313(a) and (b), Mil.R.Evid. Respondent, rejecting the Government's inspection argument, ruled that Rule 312(d), Mil.R.Evid. applied to the stipulated facts and, in the absence of the requisite search authorization predicated on probable cause, required suppression. *See* Rule 315, Mil.R.Evid.

Upon petition by the Government to this Court for extraordinary relief from Respondent's ruling, we, on 17 December 1982, imposed a stay on further proceedings in the trial pending resolution of the petition. Upon reconsideration of his order of suppression, Respondent on 18 December adhered to his earlier decision. Oral argument was held before the Court on 16 February 1983.

## I

Appellate counsel have cited numerous federal and state cases which analyze and discuss those situations in which an appellate tribunal could appropriately issue the extraordinary writ of mandamus. In surveying these and other cases, we come to the same conclusion as that advanced in Mr. Justice Harlan's prevailing opinion in *Glid-*

den Co. v. Zdanok, 370 U.S. 530, 568, n. 33, 82 S.Ct. 1459, 1482, n. 33, 8 L.Ed.2d 671 (1962):

> Without examining anything else, it is enough to note that the considerations governing a grant or denial of a petition for mandamus are ... so discretionary with the Court as to deprive a denial of precedential effect on this score.

Nevertheless, we are properly constrained, and restrained, in determining whether the issuance of the requested writ is "necessary or appropriate in aid of (our) jurisdiction and agreeable to the usages and principles of law",[2] by the following general admonitions: that peremptory writs "are drastic and extraordinary remedies" to be "reserved for really extraordinary cases," in which "appeal is a clearly inadequate remedy,"[3] *Ex parte Fahey,* 332 U.S. 258, 259, 260, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947); that mandamus does not "run the gauntlet of reversible errors," *Bankers Life and Cas. Co. v. Holland,* 346 U.S. 379, 382, 74 S.Ct. 145, 147, 98 L.Ed. 106, 111 (1953); that mandamus is not "to be used as a substitute for (the lack on the part of the Government in the military system of a right to) interlocutory appeal," *Will v. United States,* 389 U.S. 90, 97, 88 S.Ct. 269, 274, 19 L.Ed.2d 305, 311 (1967); that, as "in the federal jurisprudence ... appeals by the Government in criminal cases are something unusual, exceptional, not favored," *Carroll v. United States,* 354 U.S. 394, 400, 77 S.Ct. 1332, 1336, 1 L.Ed.2d 1442 (1957), the use of a writ to correct an error which could not be reached by appeal, under the federal system, must be viewed with an even greater degree of circumspection and its employment even more so restricted; that mandamus is a "remedy long restricted ... in the main, to situations where ministerial duties of a nondiscretionary nature are involved." *Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d

---

1. Article 15, Uniform Code of Military Justice.

2. All Writs Act, 28 U.S.C. § 1651.

3. We recognize the difference between interlocutory "appeal" in the federal system, initiated by the Government, and "appeal" in the military system, initiated by operation of law as a matter of right benefiting a military accused.

788, 793 (1958); and that the party requesting mandamus has "the burden of showing that its right to issuance of the writ is 'clear and indisputable.'" *Bankers Life and Cas. Co., supra.*

We similarly approach our review of this petition cognizant of the fact that this Court's power to issue the peremptory writ of mandamus [4] is limited by the concept of discretion predicated on a two-tiered analysis: (1) The absolute discretion of a trial court to decide an issue which lies *within* the sphere of *its* discretionary power extends to deciding that issue erroneously; and (2) The discretion of this Court in determining the propriety of issuing a writ does not extend to mere substitution of our discretion for that of the trial court. *See Dettinger v. United States,* 7 M.J. 216 (C.M.A.1979).

As to the former tier, the power to err in exercising discretion ceases to be absolute when the legitimate boundaries of that power are exceeded. As to the latter, the vitality of the discretion which we possess to issue a peremptory writ will be severely impaired if judicial restraint is abandoned under the guise of exercising discretion, in favor of a *de novo* judgment as to the "rightness" of a trial court's ruling.

Our function in considering a petition for extraordinary relief is not to chill the *lawful* exercise of discretion or to control the legitimate decision making process of the trial court. In this regard, we acknowledge the following cautionary guidance issued by the United States Supreme Court:

> "Courts faced with petitions for the peremptory writs must be careful lest they suffer themselves to be misled by labels such as 'abuse of discretion' and 'want of power' into interlocutory review of non-appealable orders on the mere ground that they may be erroneous."

*Will v. United States, supra* 389 U.S. at 98, n. 6, 88 S.Ct. at 275, n. 6.

Thus, while the power to issue a peremptory writ is discretionary with an appellate court, and not a matter of right running to its proponent,[5] the appellate tribunal, when considering a petition for extraordinary relief, must focus on certain principles, developed by case law, which have emerged to guide the Court in determining if and when such discretion should be exercised. Among other grounds not pertinent to our inquiry,[6] we distill from the cases surveyed the sound proposition that an appellate court can, and should, issue a peremptory writ of mandamus to correct "jurisdictional error" committed by a lower court. The Supreme Court of the United States articulated the general rule thusly:

> The peremptory writ of mandamus has traditionally been used in federal courts only 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to to do so.' (Citation omitted). While the courts have never confined themselves to an arbitrary and technical definition of 'jurisdiction,' it is clear that only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy. (Citations omitted).

*Will v. United States, supra* 389 U.S. at 95, 88 S.Ct. at 273.

While we may want for a panacean definition of "jurisdiction" in this context, we believe the clear import obtained from the term is that a trial judge possesses the discretion to decide all matters encompassed within his statutory or inherent power, subject only to those limitations which the law has placed upon that power. The exercise of a trial judge's discretion is necessarily guided by the law. His power to exercise that discretion is circumscribed by the rules

---

4. *See Dettinger v. United States,* 7 M.J. 216 (C.M.A.1979); and *United States v. Redding,* 11 M.J. 100 (C.M.A.1981).

5. *See* Rule 30, Rules of the Supreme Court of the United States, and cases cited therein.

6. For example, to force a lower court to comply with the orders directed to it by an appellate court, or, to preclude a lower court from defeating, by unlawful action, a court's appellate jurisdiction.

and principles of law. "Law" in this usage encompasses the Constitution, Federal statutes, appellate decisions, and, as embodied within the military system, the UCMJ and *Manual for Courts-Martial, 1969 (Rev.)* (MCM), including the Military Rules of Evidence. Clearly, if the actions of a trial judge exceed those limitations on his power specified in, or necessarily inferred from, the Constitution, Federal statutes, or decisional law, a threshold showing of the existence of grounds for issuing a writ to correct that excess would be made out. We perceive no valid reason for not similarly concluding that a military judge can be enjoined by extraordinary writ, from exceeding the limits of power set forth in the UCMJ or MCM.

■ We believe it to be an accepted principle that a court acts beyond its power if its decision, ruling or conduct is so at variance with any reasonable interpretation of a statute or rule of law as to amount to an arbitrary, capricious, and irresponsible act. As discretion and power are co-extensive, and for all practicable purposes synonymous, the lawful exercise of judicial discretion cannot exceed the recognized boundaries of judicial power. Therefore, if a trial judge exceeds his power, he perforce abuses his discretion. Those acts which are so abusive are extrajudicial, and reachable by extraordinary writ.

■ Though a military judge has the power, and therefore the discretion, under the Military Rules of Evidence to order evidence, obtained in contravention of those Rules, to be suppressed, *see* Rule 311, Mil.R. Evid., he exceeds that power if, by its very language, the rule of evidence relied upon as the basis for his ruling can, under no circumstance as applied to the limited issue presented to him, support that ruling. As applied to the singular issue presented in this petition, we would find adequate and compelling grounds to exist for issuing a writ of mandamus if Rule 312(d), Mil.R. Evid. is so clear and unambiguous in setting forth the intendment of its scope that no

reasonable, logical or common sense construction of that Rule could support the granting of the motion to suppress. In such instance the ruling would be so arbitrary, capricious, and irresponsible, and so at variance with the clear mandate of the law, as to be beyond the lawful jurisdiction of the court.

II

■ As stated earlier in this opinion, the Government advanced the position that the seizure of the urine specimen from Vining was the product of a properly conducted command-directed inspection, and, therefore, Rule 313(b) Mil.R.Evid., "Inspections and Inventories in the Armed Forces," governed the question of admissibility.

We need not recite the harmful, adverse, and deleterious impact of drugs upon, and their proliferation within, the military community, its health, welfare, safety, efficiency, and, most importantly, its readiness. See the comments of Chief Judge Everett in *United States v. Trottier,* 9 M.J. 337, 345–348 (C.M.A.1980). The necessity to find a procedurally legal vehicle which could be employed at the command level to counter the rampancy of the drug epidemic within the military was a foremost consideration of the drafters of Rule 301, *et al,* of the Military Rules of Evidence. The "Health and Welfare" inspection has long been a traditional and legitimate instrument for exercising power by, and within the inherent authority of, a military commander. Due, however, to the perceived ambiguity in the decisional law governing inspections at the time the Rules were being drafted, it was considered necessary to explicate, by codification, that authority. *See* Saltzburg, Schinasi, and Schlueter, Military Rules of Evidence Manual, (Drafter's Analysis), at 125–126. The primary purpose of enacting Rule 313(b), Mil.R.Evid., into "codified" military law was to make explicit the authority of a military commander always deemed inherent in his office "to discover, correct and deter conditions detri-

mental to military efficiency and safety . . ." 7

Rule 313 is thus, in addition to its status as a rule of evidence authorized by Congress under Article 36, an express Presidential authorization for inspections with such authorization being grounded in the President's powers as Commander in Chief.

Drafter's Analysis, *supra* at 126. It is furthermore clear beyond cavil that a primary objective of Rule 313 was to strike at the heart of the drug problem in the military, by legitimizing, in its broadest meaning, the ability of a commander to "locate and confiscate" property which "would affect adversely the security, military fitness, or good order and discipline of (his) command," subject only to those limitations stated within the Rule or placed upon his actions by the Constitution.[8]

Can Rule 313 arguably be interpreted to encompass a command-directed urinalysis program in which participation is compulsory? We believe it can, and compellingly so. The examples given within Rule 313 are merely illustrative—not exhaustive—of the reach of the inspection power. Unequivocal evidence to support this proposition is found in Rule 312(b), which permits, without probable cause, an *involuntary inspection conducted pursuant to Rule 313*, of a military member's unclothed body, including a visual examination of body cavities, if (among other grounds not herein relevant) it is conducted in a reasonable fashion. To accept the general proposition that a compulsory urinalysis program also falls, as a matter of legal categorization, within the recognizably broad ambit of Rule 313 requires no distortion of, and in fact is eminently consistent with, the language and intent of that Rule.

This of course leaves open at least four areas of inquiry required by the language of Rule 313:

(1) Whether the inspection was conducted in a reasonable fashion.

(2) Whether the property located and confiscated during the inspection would affect adversely the security, military fitness, or good order and discipline of the command;

(3) Whether the inspection was in fact a subterfuge for a search;

(4) Whether *any specific provision* of Rule 312 applies to the facts and thus dictates further inquiry.

Items 1 through 3 are properly factual questions, to be resolved by a military judge after receiving evidence on the issue. Though these factual questions, if relevant to the case, should be addressed before any issue solely of law, none were litigated in the proceedings below. Item 4 is a question of law for it entails not only the legal interpretation of the reach of Rule 313 but also an interpretation of the *entirety* of Rule 312 to ascertain whether application of any specific provision thereof is mandated.

The reasoning employed by Respondent in rejecting the Government's position that Rule 313 controlled the issue of suppression is not sufficiently articulated to enable us to determine whether he accepted, as an initial premise, the proposition that a command-directed compulsory urinalysis program does fall within Rule 313. If he did not, based on our reasoning above, he erred. If that were the sole issue to be resolved on this petition, however, we would decline without hesitation to grant a writ of mandamus, for the law is not so settled nor the language of the regulation so unambiguous and clear as to render wholly unreasonable an interpretation of Rule 313 which would operate to exclude command-directed compulsory urinalysis sweeps from the coverage of the Rule. For the purposes of our resolution of this petition, we will assume that

---

7. "[Inspections] must be considered as a condition precedent to the existence of any effective armed force and inherent in the very concept of a military unit." Saltzburg, Schinasi, and Schlueter, Military Rules of Evidence Manual.

8. As Rules 301, *et al*, Military Rules of Evidence were an attempt to codify then existing constitutional standards, most constitutional limitations on a commander's inspection authority are embodied within the Rules of Evidence.

respondent did not dismiss the Government's position as being inapplicable under Rule 313 and, instead, proceeded to inquire whether the inspection at issue "compl(ied) with Rule 312, if applicable." Obviously, "an inspection, search or seizure that would be lawful but for noncompliance with ... Rule (312) is unlawful within the meaning of Rule 311."[9]

### III

As we will presume that the decision to suppress was predicated solely on an interpretation of Rule 312(d), Mil.R.Evid. as applied to the stipulated facts before the court, we set forth the Rule in its entirety:

> Seizure of bodily fluids. Nonconsensual *extraction* of bodily fluids, including blood and urine, may be made from the body of an individual pursuant to a search warrant or a search authorization under rule 315. Nonconsensual extraction of bodily fluids may be made without such warrant or authorization, notwithstanding Rule 315(g), only when there is a clear indication that evidence of crime will be found and that there is reason to believe that the delay that would result if a warrant or authorization were sought could result in the destruction of the evidence. Involuntary *extraction* of bodily fluids under this Rule *must be done in a reasonable fashion by a person with appropriate medical qualifications.*

We have placed emphasis on certain words because the interpretation given those words, singularly and in context as a whole, suggests the resolution of the present petition. The initial question is of course the *intended* scope of Rule 312(d). Based on the unambiguous language utilized in the statement of the Rule, as well as the Drafter's Analysis, the answer is clear—extraction of bodily fluids where consent is lacking. A *reasonable* interpretation of the Rule's scope would, of necessity, be suggested, and thus be limited, by the same unambiguous language employed in the statement of the Rule. Our focus is thus drawn to the primordial, and critical, word of the Rule—"extraction".

As a guide to the interpretation of this word (though it is questionable whether a word so clear requires interpretation) and, thus, the Rule which it so predominantly governs, we rely on the following rule of statutory construction set forth in *United States v. Padilla,* 1 U.S.C.M.A. 603, 607, 5 C.M.R. 31, 35 (1952):

> It is a familiar learning that the meaning of a writing must be arrived at by ascertaining the *intent of its author,* if possible. This intent will ordinarily be found through a *grammatical approach* to the language of the writing itself. However, where, through ambiguity or otherwise, this method fails, resort must be had to its object and the circumstances of its preparation or promulgation. (Citations omitted). Effort must be made to effectuate its purpose and to *avoid rendering it absurd.* (Citations omitted) (emphasis added).

The root word is "extract," which, in its application to bodily fluids, can be variously defined to mean "to draw forth," "to pull or take out forcibly," or, "to withdraw by physical or chemical process." *See* Webster's New Collegiate Dictionary. Under any of these accepted, and reasonably exhaustive, definitions, it cannot be sensibly or reasonably advanced that anything less than some minimal degree of force, *applied by another,* that is, an "extractor," is an absolute requisite to fitting the act complained of within the common sense interpretation of the word. A mere order or command, the "compulsory" aspect of the urinalysis program, without more, to perform, in normal course, the natural function of voiding human waste could never suffice to meet this threshold definitional requirement. The "grammatical approach" thus ineluctably yields the conclusion that the order to provide a urine specimen directed to Vining, and the collection of same for subsequent analysis, *did not, and could not,* amount to an "extraction." Any other interpretation would be unreasonable. Is it

---

**9.** *See* Drafter's Analysis to Rule 312(a).

not an unreasonable act to ascribe to a word a "created" meaning which would be wholly at variance with, and a distortion of, its accepted, and obviously intended, definition?

What was the "intent of its author?" Rule 312(d) cannot be read in a vacuum. It obtains its full meaning by reference to the language of the entirety of Rule 312, as well as the comments of its drafters. No one would take issue with the observation that Rule 312 establishes a "sliding scale approach to bodily evidence problems."[10] The Rule utilizes two distinct concepts which, when considered together, epitomize this approach: (1) the requirement of a warrant or authorization under certain circumstances; and, (2) the requirement that the person committing the intrusion or performing the extraction (the extractor) possess appropriate medical qualifications. A hierarchy of protections for the privacy of an individual is established within Rule 312 and the evidence of its balancing against the right of the Government to interfere with that privacy is replete. As the legitimate right of personal privacy increases, so do the restraints placed upon interfering Governmental action.[11]

It is so readily discernable as to be self-evidence that the authors of Rule 312 intended the Government to be able to exercise, within applicable constitutional boundaries, the fullest measure of power necessary to meet the harm posed. Where the right of privacy and the potential for bodily injury to the individual as a result of the intended intrusion are non-existent, neither probable cause nor medical qualifications, of any degree, are required. If a right of privacy can arguably be made out, but is secondary to the interposition of a recognizedly valid governmental interest, and a possibility of bodily injury to the individual might result from the intended intrusion, then appropriate medical qualifications, however minimally necessary under the circumstances, are required, though probable cause is not. When the governmental interest becomes constitutionally subordinate to the individual's right to privacy under the Fourth Amendment and the potential for bodily injury to the individual resulting

---

10. *See* Editorial Comment, page 116, to Saltzburg, Schinasi, and Schlueter, Military Rules of Evidence Manual.

11. The following matrix reveals the balance achieved within Rule 312 between the privacy of the individual and the interests of the Government:

| Degree of Intrusion | Probable Cause Required | Medical Qualifications Required |
|---|---|---|
| a. Visual examination of unclothed body | | |
|    (1) consent | no | no |
|    (2) nonconsent | no | no |
| b. Nonconsensual intrusion into mouth, nose, ears | no | no |
| c. Nonconsensual intrusion into other body cavities to seize | | |
|    (1) if plain view | no | yes |
|    (2) if discovered during visual examination of body | no | yes |
| d. Nonconsensual intrusion into other body cavities to search and thereafter seize. | yes * | yes |
| e. Nonconsensual extraction of bodily fluids | yes ** | yes |
| f. Other nonconsensual intrusions searches, and seizures (includes surgical intrusions and forced ingestion) | yes | yes |

\* Confinement facilities exception
\*\* Exigencies exception

from a contemplated intrusion or extraction increases, then both probable cause and appropriate medical qualifications are required. "Appropriate" as used in Rule 312 means at the very least "some" medical qualifications. Compare Rule 312(b) and (c) with Rule 312(c)(1) and (2), (d) and (e).

It is abundantly clear that if an act which falls within the purview of Rule 312, be it a bodily view or bodily intrusion, *does not* require "some" quantitative medical qualifications incident to its performance, then no probable cause requirement exists as a condition precedent to lawfully performing the act. While not every "extraction" requires the existence of probable cause, *see* Rule 312(f), those which do must, *a fortiori,* be performed by someone possessing medical qualifications appropriate to the manner of extraction. Does it not stretch credulity to suggest that the person assigned to merely take custody of a urine specimen provided by an individual who is performing a natural act, albeit one he is ordered to perform, must possess *any* medical qualifications to so act? Most certainly it does. It therefore follows that the reach of Rule 312(d) cannot sensibly or logically be extended to encompass providing a urine sample pursuant to a command-directed compulsory urinalysis program, for that rule, by its very language, and in every instance to which it is applicable, requires both the existence of probable cause and the possession of appropriate medical qualifications by the extractor. To conclude otherwise is to render the clear import, intent and purpose, and, yes, the very language, of Rule 312(d), as well as 312 in its entirety, ineffectual and thus absurd.[12]

We are therefore convinced that Rule 312(d) affords absolutely no basis for suppression of, and the exercise of reasoned judgment precludes its use as a vehicle to suppress, the analysis of a urine specimen which is obtained through compulsory participation in a command-directed urinalysis program.

Earlier in this opinion (Part I) we concluded that a writ of mandamus would properly issue if the language, intent, and purpose of a rule was so clear and unambiguous as to render its disregard an arbitrary, capricious, and irresponsible judicial act, for such would be judicial usurpation by definition. In light of the judicial guidance for statutory construction offered in *United States v. Padilla, supra,* we must now ask: If an interpretation is placed upon a rule of evidence, the language of which is unequivocally clear, which renders that language, as well as the rule's intent and purpose, wholly absurd, can it be reasonably suggested that such an interpretation is anything other than arbitrary, capricious, and irresponsible? The answer must be no. While a military judge possesses the discretion to interpret the law, and even to err in his interpretation and thus hold himself immune from the substituting judgment of a higher court, he has neither discretion nor power to *rewrite* the law, and, in so doing, vitiate the purpose of the law and render nonsensical its clear language and intendment. Such conduct is repugnant to the law and a writ of mandamus will properly lie to curb the flagrant abuse of discretion thus evidenced.

Finding respondent's interpretation and application of Rule 312(d) to be unsupported by reason and a distortion of its intent, purpose and language, and his process of interpretation so at variance with accepted rules of statutory construction as to exceed the legitimate boundaries of his judicial power, we will invoke the extraordinary remedy of mandamus. Accordingly, the petition is granted.

---

**12.** We do not reach the issue of the applicability of the Fourth Amendment's proscription against unreasonable searches and seizures, and the requirement of probable cause incident thereto, or the Fifth Amendment's self-incrimination provision, to the situation where, rather than a random urinalysis inspection, the facts reveal that suspicion has focused on a specific individual and, in the absence of probable cause, he is ordered to provide, when nature dictates, a urine specimen. As to the Fifth Amendment, *see Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); as to Article 31, U.C.M.J., *see United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980).

## IV

It has been suggested that if this Court issues the writ requested, it will be substituting its judgment for that of the trial court on an issue solely involving the admissibility of evidence. We disagree. Scarcely any ruling on the admissibility or inadmissibility of evidence can be resolved strictly as a question of law. Such rulings are legal conclusions based upon the facts then pertinent and the law applicable to those facts. For example, if under a situation properly within the scope of Rule 312(d), the military judge ruled evidence inadmissible (under Rule 311) because probable cause did not exist, or the authorization was invalid, or the medical qualifications of the "extractor" of the bodily fluid were insufficient in view of the method of extraction, then, even if we disagreed with his legal conclusion, we would not issue a peremptory writ as long as the findings of fact upon which the ruling was predicated were arguably supported by the evidence of record. Similarly, if resolution of an issue involved the interpretation of Rule 313, we would not second-guess a military judge if he found, under the facts presented, no adverse affect to the fitness of the command, or a search in the guise of an inspection, or the absence of reasonable suspicion that contraband was located within a given command, or that the technological aid utilized was unreasonable, or, as we have earlier stated, that given the present status of the law, a command-directed urinalysis program is not encompassed within the term "inspection."[13]

What facts are essential to decide whether Rule 312(d) applies in the instant petition? None. The issue is purely a legal one: Is the collection of a urine sample which is voided by natural process an "extraction." It is only if this issue were answered in the affirmative, which it clearly is not, that an issue involving the admissibility of evidence would be presented.

Furthermore, in concluding, as we do, that Respondent flagrantly abused his discretion, we are mindful of the decision rendered by a different panel of this Court in *United States v. Mitchell,* 15 M.J. 654 (N.M. C.M.R.1983) in which, on *facially* similar facts, a writ of mandamus was denied. *Mitchell* also involved the Navy's compulsory urinalysis program, but the accused in that case was required to ingest fluids (water) in order to void the requested sample. The ruling of the military judge, barring the results of the urinalysis as evidence at trial, was predicated on a construction of Rule 312(e), Mil.R.Evid. While we join the Court in its expression of reservation concerning the correctness of the judge's interpretation of the rules of evidence, there exists a reasonable ground, founded on Rule 312(e), from which to conclude that the words of that rule[14] are sufficiently broad in meaning to apply to ingestion of water to speed the natural elimination of bodily waste. Clearly, as reasonable persons could differ as to the meaning of the referenced sentence, a peremptory writ was an inappropriate vehicle to correct what was concluded to be an error of reasoning. In contrast, there can be advanced, under the only reasonable interpretation of Rule 312(d), no logical application of that rule which would permit construing the term "extraction" in a manner consistent with the processes of voiding, as nature intended, a urine specimen.

## V

Though not necessary to our determination on the advisability of issuing the writ, and not considered in reaching our decision, we believe it appropriate to offer the following comments. We take judicial notice of the Navy's "Get Tough" policy against drugs, and the program devised for its implementation. That policy announces a "war" against drug abuse—a war which

13. We again offer our opinion that, as a general proposition, such a program constitutes a permissible exercise of the "inspection" authority inherent in command and, thus, statutorily recognized by Rule 313(b), Mil.R.Evid.

14. "Compelling a person to ingest substances for the purposes of locating the property described above or to compel the bodily elimination of such property is a search within the meaning of this section."

must be supported within, but also to the outer boundaries of, the restraints imposed by law, by every member of the armed services.

Is it inappropriate for an appellate court to wholeheartedly support the Chief of Naval Operations' program? We think not, for notwithstanding this support, we would not hesitate to strike down any provision of the articulated policy that ran *contra* to the Constitution, applicable Federal law, the UCMJ, or the MCM. While our position, removed as it is from the operational level of command, insulates us from having to *personally* confront the drug problem in the military, we can, by virtue of our review role in the military justice system, *bear witness* to the manner and extreme in which it undermines good order, discipline, and the welfare of our service. We, in fact, would be blind not to recognize the epidemic proportions to which the drug culture has permeated our military community and the cavalier manner in which it, at times, appears to be accepted as an incident of military life.

The oft-articulated view that what a sailor does in his off-duty hours is "none of my concern" must die. It should never have been born! The evidence is in, it is convincing, and it is alarming: Even the most minor use or abuse of drugs is inimical to, and has a debilitating effect upon, the ability of the armed forces "to perform (their) constitutional duty to fight—and to be fully prepared to fight—to protect this country's national interests." [15]

We offer these comments, however subsequently denominated, to suggest a perspective that we believe is essential in analyzing the constitutionality, or legality under the Rules of Evidence, of the compulsory urinalysis program. It is well recognized that the involuntary seizure, pursuant to an "inspection" as defined in Rule 313, Mil.R. Evid., of weapons, contraband, illicit substances, or other property which it is illegal to possess, brings that conduct within the

scope of the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

■ We have previously stated our view that a command directed urinalysis program, even though compulsory, is encompassed within the inherent "Health and Welfare" inspection authority of a military commander and is now statutorily embraced within Rule 313(b). It follows, therefore, that such a urinalysis program, and the seizure incident to its implementation, must be tested by the standards embodied within the Fourth Amendment.

When consideration focuses on identifying that standard, we conclude that, if the urinalysis program otherwise meets the requirements established by Rule 313, the standard under both the Fourth Amendment and Rule 313 is the requirement of "reasonableness." It is not "probable cause," which by its very terms also embraces the concept of reasonableness. *See United States v. Lange,* 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965).

The Fourth Amendment protects the reasonable expectation of privacy of an individual. The existence of a right of privacy does not, *a fortiori,* create or require the right to a remedy for its invasion. To the contrary, the right to privacy, far from being absolute, is, under appropriate circumstances, made subordinate to and conditioned upon the greater right of society to preserve itself and its citizens. In the military context, we are talking about the right of the military society to reduce a substantial threat to its readiness and efficiency, its health and welfare, and thus to preserve its ability to protect the interests of this nation, both at home and abroad.

In seeking a balance between the rights of the individual and the right of society, the term "reasonableness," as a constitutional and statutory requirement, suggests that, of all viable alternatives available to respond to a threat which the Government

---

**15.** For an incisive insight into the drug problem in the armed forces, *see United States v. Trotti-* *er, supra,* at 345–348.

has both the right and the duty to meet, the one chosen by the Government must be the one which results in the least possible intrusion upon the privacy and dignity of the citizen. When we assess the alternative chosen—command-directed compulsory urinalysis—in light of the recognized and substantial threat posed—the present drug problem—we must conclude that the program is not only a reasonable means, but the *only reasonable means available,* to meet the threat.

What alternative methods, less intrusive in scope, are available to combat the problem of drug abuse and thus preserve the health, welfare, and safety of the military unit? The traditional means of conducting a "health and welfare" inspection—gate search, locker search, personnel inspection—are wholly inadequate to the task. A service member can escape detection by these means by limiting his abuse to off-duty, off-base hours. The annual physical is similarly inappropriate. Though compulsory urinalysis as part of a physical examination is sanctioned by law, see Rule 312(f), Mil.R. Evid., abstinence for the requisite period [16] on the part of an abuser can effectively nullify the annual physical as a means of meeting the threat which drug abuse poses to the health and welfare of the military unit. Similarly, relying on each service member to do his duty and report incidents of drug abuse is, unfortunately, an empty dream.

It is thus self-evident that *no other method adequate to meet the threat of drug abuse is now available.* Where the choice is narrowed to accepting a limited and reasonable intrusion on the privacy of the individual, such as results from the urinalysis program, or being rendered impotent to combat, by any effective means, the epidemic of drug use and abuse, the Fourth Amendment will not bar the limited and reasonable intrusion. Rule 313(b), and the inspection authority codified therein, should be similarly interpreted.

Senior Judge ABERNATHY and Judge MALONE concur.

---

**16.** By this we mean that period of time from the last day of drug usage after which the

testing method chosen would yield no valid results.